Dennis Thurl DOWTHITT, Appellant,

v.

STATE of Texas, Appellee.

No. 71,554.

Court of Criminal Appeals of Texas.

June 26, 1996.

Rehearing Denied Oct. 16, 1996.

William E. Hall, Jr., Conroe, for appellant.

Michael R. Davis, Asst. Dist. Atty., Conroe, Matthew Paul, States Atty., Austin, for State.

## OPINION

KELLER, Judge.

At a trial beginning in August 1992, a jury convicted the appellant of committing, on or about June 13, 1990, the capital murder (murder during the course of aggravated sexual assault) of Gracie P.[1] The jury answered the punishment issues in the State's favor, and appellant was sentenced to death. Direct appeal to this Court is automatic under Article 37.071(h)(1990).[2] Appellant raises fourteen points of error on appeal. We will affirm.

### 1. Sufficiency of the evidence

#### a. *Corroboration of accomplice testimony*

In point of error twelve, appellant contends that the evidence is insufficient to corroborate the testimony of Delton Dowthitt, appellant's sixteen-year-old son and accomplice to the capital murder. Delton testified at trial that he and his father picked up Gracie, age sixteen, and her younger sister Tiffany, age nine, for the ostensible purpose of driving them to their home. Instead, appellant stopped his pickup truck on a deserted road. Delton testified that he talked with Gracie outside while appellant remained inside the truck alone with Tiffany. At some point, appellant exited the vehicle and approached Delton. Appellant said that he had made a mistake and both of the girls would have to die. According to Delton, appellant used his knife to make a cut on Gracie's throat, snatched a beer bottle, and used the beer bottle to sexually assault her. Gracie was still alive during those events. Later, appellant killed Gracie by cutting her throat a second time. Meanwhile, Delton strangled Tiffany to death.

■ Appellant argues that Delton's testimony was not sufficiently corroborated. Because Delton was clearly an accomplice as a matter of law, his testimony must be corroborated by other evidence tending to connect appellant to the offense. Article 38.14.[3] No precise rule can be formulated as to the amount of evidence required to corroborate. *Gill v. State,* 873 S.W.2d 45, 48 (Tex.Crim. App.1994). The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. *Gill,* 873 S.W.2d at 48. *Munoz v. State,* 853 S.W.2d 558, 559 (Tex.Crim.App.1993). *Cox v. State,* 830 S.W.2d 609, 611 (Tex.Crim.App. 1992). Nor must the non-accomplice evidence directly link the accused to the commission of the offense. *Gill,* 873 S.W.2d at 48. *Munoz,* 853 S.W.2d at 559. *Cox,* 830 S.W.2d at 611. While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. *Gill,* 873 S.W.2d at 49. *Cox,* 830 S.W.2d at 611. Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration. *Munoz,* 853 S.W.2d at 559.

■ The non-accomplice corroborating evidence consisted of the following:

(1) Appellant admitted that he was present during the commission of the crime although he denied guilt of the offense. Other witnesses saw appellant and Delton together in the evening before and after the murders.

(2) Non-accomplice witnesses testified that appellant had blood spatters on his shirt. A state expert testified that a person who inflicted the type of wound

---

**1.** Texas Penal Code § 19.03(a)(2)(1990) provides that a person commits capital murder when "the person intentionally commits the murder in the course of committing or attempting to commit ... aggravated sexual assault" (ellipse inserted).

**2.** All references to articles refer to the Texas Code of Criminal Procedure unless otherwise indicated.

**3.** Art. 38.14 provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

the victim suffered would have blood spatters on his clothing.

(3) A glass beer bottle was found on appellant's business premises. The bottle had the victim's blood on it and a fingerprint belonging to appellant. An expert testified that the injuries suffered by Gracie were consistent with those which would have been inflicted by a beer bottle such as the one found.

(4) Appellant admitted to his aunt that he "did it" and he made Delton "do it" although he never specified what "it" was.

(5) Appellant asked one of his daughters for forgiveness for an unspecified event on June 13, 1990 (alleged date of the murders).

(6) Appellant's daughters and sister testified that he habitually carried a knife. One of the daughters recognized the murder weapon as a knife carried by appellant. This daughter further stated that the knife was distinctive because of ridges on its top.

The evidence shows not only appellant's presence during the commission of the crime but numerous other circumstances connecting appellant to the offense. Delton's testimony was sufficiently corroborated. Point of error twelve is overruled.

### b. *Underlying offense*

█ In point of error nine, appellant contends that the evidence is insufficient to show that the murder occurred during the course of an aggravated sexual assault. He argues that the evidence shows, instead, "sexual assault during the course of a murder" because appellant formed the intent to murder Gracie before he decided to sexually assault her. Appellant relies upon *Garrett v. State*, 573 S.W.2d 543 (Tex.Crim.App.1978), which established the felony murder merger rule.

Initially, we note that *Garrett* is inapplicable to a capital murder prosecution. *Fearance v. State*, 771 S.W.2d 486, 492–493 (Tex.Crim.App.1988). *See also Muniz v. State*, 851 S.W.2d 238, 243–249 (Tex.Crim.App.), *cert. denied*, 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993)(merger doctrine rejected

in context of aggravated sexual assault as underlying offense for capital murder).

Moreover, appellant's logic is flawed. Even if appellant formed the intent to murder before he formed the intent to commit aggravated sexual assault, the murder itself could still have occurred "during the course of" the aggravated sexual assault. The evidence in the present case shows that appellant used a beer bottle to sexually assault Gracie while she was still alive and delivered the fatal injury shortly thereafter. This situation is distinguished from instances in which the intent to commit the alleged underlying offense forms *after* the murder is complete. The latter situation is most commonly illustrated by the "afterthought theft" scenario. *See Moody v. State*, 827 S.W.2d 875, 892 (Tex.Crim.App.), *cert. denied*, 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.Crim.App. 1986). Under the "afterthought theft" scenario, the murderer decides to commit a theft only after the murder, committed for reasons unrelated to theft, is already complete. *See* authorities above. Under that scenario, the offender is not guilty of capital murder but of ordinary murder and theft.

Because the victim in the present case was still alive, the aggravated sexual assault could not have been an "afterthought" but was intertwined with the murder. Although not directly addressing appellant's argument, we have previously held that a murder may be in the course of an aggravated sexual assault even though the sexual assault is completed before the murder commences. *Lincecum v. State*, 736 S.W.2d 673, 680 (Tex. Crim.App.1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1988). *Wooldridge v. State*, 653 S.W.2d 811, 816 (Tex.Crim.App.1983). Because appellant intended to murder Gracie at the time he sexually assaulted her, and he completed the murder shortly after the sexual assault, appellant's conduct is sufficient to establish murder during the course of aggravated sexual assault. Point of error nine is overruled.

### 2. Voir dire

█ In point of error one, appellant claims that the prosecution improperly used the

hypothetical of aiding suicide to illustrate a circumstance in which probation might be an acceptable punishment for murder. He argues that the hypothetical is not an example of murder at all because the example used by the State involves a person who merely supplies the victim with the means to commit suicide without actually participating in the commission of the suicide. He claims that the hypothetical thus constitutes a misstatement of the law used to qualify jurors on the range of punishment.

We need not address the merits of this allegation because any error would be harmless. Because appellant was convicted of capital murder, any erroneous or misleading hypotheticals to prospective jurors about punishment for the lesser-included offense of murder made no contribution to appellant's conviction or punishment. *Jones v. State,* 843 S.W.2d 487, 498 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). Point of error one is overruled.

In point of error two, appellant argues that the trial court erred by denying his challenge for cause of an allegedly pro-death penalty venireman. But, appellant was granted an additional peremptory strike, which he never used. To preserve error concerning the denial of a challenge for cause, the appellant must exhaust all peremptory challenges, ask for more, be refused, and point out an objectionable juror who was seated. *Garcia v. State,* 887 S.W.2d 846, 852 (Tex.Crim.App.1994). *Green v. State,* 840 S.W.2d 394, 402 (Tex.Crim.App. 1992), *cert. denied,* 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). *Harris v. State,* 790 S.W.2d 568, 581 (Tex.Crim.App. 1989). Appellant has failed to preserve error. Point of error two is overruled.

In point of error three, appellant argues that the trial court erred by overruling his motion to postpone the exercise of peremptory challenges until the completion of voir dire. Appellant claims that his rights to due process and effective assistance of counsel were violated. We have previously held that there is no due process or equal protection violation for refusing to permit retrospective strikes in capital cases. *Janecka v. State,* 739 S.W.2d 813, 833–834 (Tex.Crim. App.1987).

As for the effective assistance of counsel claim, appellant does not distinguish it from his due process argument. For both claims, he merely argues that he does not have the benefit of looking at the venire as a group so that he may exclude the most undesirable veniremen. This argument is similar to the one made by the defendant in *Janecka. Id.* As we explained in *Janecka,* a capital defendant has several advantages in voir dire: he is permitted to examine the veniremen in great detail in isolation and he does not have to exercise a peremptory strike until the State has first decided whether to do so. *Id.* at 834. The minor disadvantage suffered by not having the benefit of viewing the group as a whole is not of sufficient magnitude to prevent counsel from intelligently exercising peremptory challenges. Point of error three is overruled.

In point of error four, appellant complains that the trial court erred by overruling appellant's motion to supplement the venire panel. Only 122 of the 275 veniremen summoned actually showed up for jury service. Appellant asked the trial court to attach the remaining veniremen and make them show up for voir dire. He argues that the trial court's refusal to do so violates his right to a "broad cross-section" of the community represented in the venire.

The statute for attaching veniremen, Article 35.01, is directory, not mandatory, and in the absence of governmental misconduct in summoning the venire, the failure to grant attachments is not reversible error unless appellant shows injury. *Jackson v. State,* 745 S.W.2d 4, 17 (Tex.Crim.App.), *cert. denied,* 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). *Hernandez v. State,* 643 S.W.2d 397, 400 (Tex.Crim.App.1982), *cert. denied,* 462 U.S. 1144, 103 S.Ct. 3128, 77 L.Ed.2d 1379 (1983). *Porter v. State,* 623 S.W.2d 374, 376–377 (Tex.Crim.App.1981), *cert. denied,* 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982).

While there is a constitutional right to a "cross-section" of the community in the

venire, this right relates to the relative composition of the panel, not the number of veniremen who show up. The complaining party must show an "identifiable class" excluded from the venire. *Taylor v. Louisiana*, 419 U.S. 522, 525–526, 95 S.Ct. 692, 695–696, 42 L.Ed.2d 690 (1975). Appellant has not shown how he was denied a "cross-section" nor has he alleged any other injury. Point of error four is overruled.

### 3. Oral and written statements

At trial, appellant moved to suppress both oral and written statements on various grounds. The trial court denied the motion. The trial court also refused appellant's request to limit the method of conveying the contents of tape-recorded oral statements to playback of the recordings themselves. In points of error five through eight, appellant challenges these rulings. He complains about the admission into evidence of portions of the videotaped oral statements and his third written statement to the police. We find that the evidence was properly admitted, but even if there were error, it would be harmless beyond a reasonable doubt. Because there are several factual and legal issues common to all four of these points of error, we have consolidated the points in several sections to discuss the common issues. We shall address the facts, the issue of custody, the merits of each individual point of error, and the question of harm in that order.

#### a. *The facts*

The following facts relate to the State's acquisition of appellant's statements: At 9:00 a.m. on June 20, 1990, appellant came to the sheriff's office to give a written statement. At that time, law enforcement officials only suspected appellant's son of the crime. Appellant finished and signed the statement at 11:00 a.m. and left for lunch. There were no *Miranda* warnings on the statement. Appellant returned at 1:00 p.m. and asked to change his earlier statement because it contained a false alibi. Detective Hidalgo interrogated appellant sporadically until 6:00 p.m., when appellant's second written statement was signed. There were no *Miranda* warnings on the second statement.

The police suggested that appellant take a polygraph test due to the inconsistencies between the two statements. Appellant agreed, and the test began at 7:00 p.m. The polygraph examination was recorded on videotape (Video # 1). At the beginning of the polygraph examination, the examiner (Hendricks) told appellant that he was not a suspect but that procedure required the reading of certain warnings. At that point, Hendricks read *Miranda* warnings. Near the beginning of the examination, appellant stated that he was exhausted. Hendricks explained that it was important to sit and discuss the issues, and the polygraph examination continued. At the end of the polygraph examination (about 11:00 p.m.), Hendricks told appellant that he had not told the complete truth about everything. Hendricks said "I'm going to step out here and talk to Detective Hidalgo for just a minute. We'll be back in and we'll visit some more." Appellant then asked, "So, um, ask him if there is any way I can talk to my wife. I know y'all are going to keep me in here." Hendricks responded but his response was inaudible. At this point the first video ended.

The second video began with Hidalgo telling Appellant "I'll go get your wife here in just a second." Hidalgo began intensive questioning of appellant ("kinesic interview" technique). At one point, appellant stated "Man, I am exhausted. All—" Hidalgo responded, "I know, I know. Listen to me. Look at me. Look at me. Look at me and tell me that you're not lying to me." The interrogation continued. Soon, Hidalgo threatened to bring in the polygraph operator: "You know that. Now, if Kelly [Hendricks] was to come back here and ask you—". Appellant replied, "But I don't want to do nothing else right now." Hidalgo testified that appellant was pointing to the polygraph machine when he made that statement.

Somewhere around midnight, appellant claimed to have chest pains. Appellant stated "I want to talk to my wife." This request was apparently ignored and an officer stated "Dennis, listen, this is one of our medics from the jail." Appellant replied that he felt bet-

ter now. His blood pressure was taken and found to be 126/80 (well within normal). Appellant was offered some cinnamon rolls to eat. Appellant declined. The law enforcement officials informed appellant that that was all they could offer. Appellant declined again.

Shortly before 1:00 a.m., Hidalgo told appellant "You were there, though, weren't you?" Appellant denied being present during the crime, and the interrogation continued. Soon, the following colloquy occurred:

HIDALGO: Why—why is it that there is something about seeing them that's bothering you so much? Tell me, Dennis. Tell, me. So I can do something.

APPELLANT: No, I really can't say no more right now. I—

HIDALGO: Yes, you can.

APPELLANT: No. My head is splitting—

HIDALGO: You're going to survive. I'm [sic] tell you. You're going to survive no matter how bad it is, you're going to survive. I guarantee you.

APPELLANT: I need some rest. I really do.

HIDALGO: You've got to be—It's got to come out. It's going to kill you if it doesn't.

APPELLANT: It's not going to help when it does.

HIDALGO: Yes, it will. Yes, it will. Please.

APPELLANT: 'Cause I'm already in it and ain't nothing going to help.

HIDALGO: I'm begging. I'm—yes, it will. It will help you. I guarantee it will help you, but you've got to tell me the truth. That's what I've been trying to tell you all along. I can't do nothing for you if you don't tell me the truth. We're not here to ruin people's lives. We're here to try to piece them back together again. That's the whole purpose I live ....to do this job.

APPELLANT: Man, I believe you. You're a good man.

HIDALGO: You've got to trust me. You've go to trust me when I'm telling you that I want to....

APPELLANT: But I am honestly so exhausted ....and—my head hurts so bad and I don't think—

HIDALGO: Do you think mine doesn't?

APPELLANT: I'm sure yours does, too.

Detective Hidalgo continued to press appellant for the truth. Hidalgo told appellant that the truth would "eat at" appellant if it did not come out. Hidalgo asked if the victims were already dead when appellant arrived. Appellant replied, "Somebody told you I was at the bowling alley, right?" Hidalgo answered that everybody saw appellant at the bowling alley, and, with Hendricks joining in, continued to press appellant for the truth. Hendricks told appellant that he was "playing against a stacked deck." Shortly thereafter, the following colloquy occurred:

APPELLANT: Man, I didn't do nothing.

HIDALGO: But you were there, not soon after it happened, weren't you? You weren't far away.

HENDRICKS: He was there the whole time.

APPELLANT: *I was there the whole time.* [emphasis added]

HIDALGO: You know what's bugging me. Look at me. Do you know what's bothering you? What's bothering you is that you couldn't do anything to stop it, could you?

HENDRICKS: It got out of control too fast.

HIDALGO: It got out of control too fast and it was all over before you even thought to try to stop it.

HENDRICKS: You knew what was happening was wrong, and you couldn't stop it.

APPELLANT: All right, man. I'm going to tell you you're right, but I can't say more than that. I need to rest.

Appellant's admission to being present during the murders occurred around 1:00 a.m. The interrogation continued. Appellant gave the details of what he observed at the crime scene, but he did not admit to participation in the murder.

Later in the interview, appellant stated that "I have already convicted myself now, and it doesn't really matter." When asked

what he meant by that statement, appellant backed away from those words and continued to maintain his innocence. This particular statement by appellant and Hidalgo's follow-up inquiries were not related to the jury. At nearly 1:30, Hidalgo stated, "Okay? Now, you do .realize, and you knew this going in, that you're not going home tonight. You know that." Appellant replied, "Yeah. I've known that for a long time." Appellant asked, "Did my wife go home?" He was told that she had.

After the interview ended, appellant was taken to Hidalgo's office where they began working on appellant's third written statement. The interrogation during this period of time was not electronically recorded, but no oral statements from this interrogation were admitted into evidence at trial. The written statement essentially repeated the facts disclosed during the videotaped oral sessions: appellant did not admit to committing the murders but admitted that he was present during the crime and gave the details of his observations. No *Miranda* warnings were given until the statement was completely written, but *Miranda* warnings were given three times before appellant signed the third statement. After he signed the statement, appellant was booked and taken to jail. Appellant had signed the third written statement at approximately 3:55 a.m.

During the entire period of time, appellant never asked to leave. When, during the hearing on the motion to suppress evidence, the prosecutor asked, "And you never chose to exercise your right to remain silent, did you, Mr. Dowthitt?", appellant replied, "No, ma'am." Although appellant had nothing to eat. during this time, he was permitted to drink coffee and smoke as much as he desired. Appellant was also given restroom breaks. Every time he went to the restroom, appellant was accompanied by a law enforcement official. The explanation given was that everyone is so accompanied because people get lost at the Sheriff's office.

An arrest warrant was not procured until sometime during the afternoon of June 21.

### b. *Custody*

▪ The point at which custody attached is relevant to the resolution of all four of appellant's points of error relating to his oral and written statements.[4] A person is in "custody" only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318——, 114 S.Ct. 1526, 1528–1530, 128 L.Ed.2d 293, 298–299 (1994). The "reasonable person" standard presupposes an *innocent* person. *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (emphasis in original). Moreover, the subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect. *Stansbury v. California*, 511 U.S. at ——, 114 S.Ct. at 1530, 128 L.Ed.2d at 300. *United States v. Mendenhall*, 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1877 n. 6, 64 L.Ed.2d 497 (1980)(opinion of Stewart, J.). *See also Dancy v. State*, 728 S.W.2d 772, 778 (Tex.Crim.App.), *cert. denied*, 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987).

▪ In the past, we have recognized four factors relevant to determining custody:

(1) Probable cause to arrest,

(2) Subjective intent of the police,

(3) Focus of the investigation, and

(4) Subjective belief of the defendant.

*Meek v. State*, 790 S.W.2d 618, 621 & 622 (Tex.Crim.App.1990). Under *Stansbury*, factors two and four have become irrelevant except to the extent that they may be manifested in the words or actions of law enforcement officials; the custody determination is based entirely upon objective circumstances. 511 U.S. at ————, 114 S.Ct. at 1528–1529, 128 L.Ed.2d at 298.

4. Appellant makes both federal constitutional and state statutory claims but does not argue that the concept of custody differs under these two types of claims. Because appellant's only developed argument about custody is with regard to a federal constitutional claim, we will analyze the issue from a federal constitutional perspective and presume that the state law standard is the same.

The determination of custody must be made on an ad hoc basis, after considering all of the (objective) circumstances. *Shiflet v. State,* 732 S.W.2d 622, 629 (Tex.Crim.App.1985). Stationhouse questioning does not, in and of itself, constitute custody. *California v. Beheler,* 463 U.S. 1121, 1124–1125, 103 S.Ct. 3517, 3519–3520, 77 L.Ed.2d 1275 (1983.) *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). *Dancy,* 728 S.W.2d at 778. *See also Russell v. State,* 717 S.W.2d 7, 11 (Tex.Crim.App.1986). Further, custody does not occur merely because the suspect submits to and fails a polygraph test. *Shiflet,* 732 S.W.2d at 631. *Stone v. State,* 583 S.W.2d 410, 413 (Tex.Crim.App.1979). However, the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Ussery v. State,* 651 S.W.2d 767, 770 (Tex.Crim.App.1983).

We have outlined at least four general situations which may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Shiflet,* 732 S.W.2d at 629. Concerning the first through third situations, *Stansbury* indicates that the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. Concerning the fourth situation, *Stansbury* dictates that the officers' knowledge of probable cause be manifested to the suspect. Such manifestation could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. Moreover, given our emphasis on probable cause as a "factor" in other cases, situation four does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.

The United States Supreme Court has twice addressed the question of "custody" in the context of a stationhouse interrogation. In *Beheler,* the suspect voluntarily accompanied the police to the station, talked for less than 30 minutes, and was permitted to return home. 463 U.S. at 1122, 103 S.Ct. at 3518–19. The Court held that this interview was not custodial. *Id.* at 1125, 103 S.Ct. at 3520. In *Mathiason,* the suspect came voluntarily to the police station, was immediately informed that he was *not* under arrest, participated in a 30 minute interview, and left the police station without hindrance. 429 U.S. at 493–494, 97 S.Ct. at 713. The Court likewise held that interview to be non-custodial. *Id.* at 495, 97 S.Ct. at 714.

This Court has also addressed the stationhouse interrogation scenario. In *Meek,* the suspect came to the fire station (arson investigation) voluntarily at a time of his own choosing, was allowed to step outside the building and go unaccompanied to his car during the interviews, and was allowed to leave unhindered after the statements were taken. *Id.* 790 S.W.2d at 622. The time at the station lasted a few hours. *Id.* at 620. This Court held that the case was very similar to *Mathiason* and that the defendant was not in custody. *Meek,* 790 S.W.2d at 621–622.

In *Turner v. State,* 685 S.W.2d 38 (Tex. Crim.App.1985), police contacted a former employee of a bakery shop in connection with a murder investigation of a baker at the shop. *Id.* at 40. The former employee was not at that time a suspect but was merely asked to accompany the police to the station to look at some photos. *Id.* The police began by asking him when he was employed and why he had quit. *Id.* During the conversation, the former employee mentioned that he had been stationed in Korea and had brought back a pair of nice boots which had a brand name of "Tong" something. *Id.* at 41. As soon as the former employee said this, the officer became suspicious because he remembered boots found in a garbage can carrying

the name "Tong Young." *Id.* At that point, the officer left his office, spoke to his partner, came back, advised the former employee of his *Miranda* rights, and obtained initialed waivers on a confession form. The former employee then made a three page confession to the crime. *Id.* This Court held that the former employee was not in custody at least until the officer realized the likelihood of the person's involvement after he mentioned the Korean boots. *Id.* at 43.

In *Dancy*, a Fourth Amendment case, a similar custody issue arose. The suspect voluntarily accompanied officers to the police station. 728 S.W.2d at 775. He answered questions posed by law enforcement officials, gave hair samples, and permitted officers to take his shoes to run print comparisons. *Id.* The interview at the station lasted about thirty-eight minutes. *Id.* at 778. Subsequently, the suspect was arrested at the station. *Id.* at 776. We held under those facts that the suspect was not in custody during the interview. *Id.* at 778–779.

 In the present case, Detective Hidalgo told appellant around 1:30 a.m. that he was not going to be permitted to leave. This express assertion itself amounted to an arrest. The closer question, however, is whether, under the circumstances of the interrogation, appellant was in custody at an earlier point in time. We believe that he was.

Like the former employee in *Turner*, appellant was not a suspect when he came to the police station but became a suspect as the interview progressed. Another similarity to the cases discussed above is that appellant voluntarily appeared at the stationhouse.

But, this case also presents striking differences. The length of time in which interrogation took place in the case at bar dwarfs the amount of time in the cases cited above. About fifteen hours passed from the time appellant returned to the police station after lunch until he signed the third written statement at 3:55 a.m. Approximately twelve hours passed between the time appellant returned to the station and the time he first admitted that he was present during the commission of the murders. Even counting from the point at which the polygraph opera-

tor assured appellant that he was not a suspect (7:00 p.m.) leaves six hours of interrogation until appellant admitted his presence during the crime. The long time period involved, while not itself dispositive, is an important factor in determining whether custody occurred before the formal arrest.

Moreover, law enforcement agents apparently ignored two requests by appellant to see his wife. While these actions may have merely been oversights, as Hidalgo and appellant became caught up in conversation (and later in addressing a potential medical emergency), they also constitute circumstances to be considered. The fact that appellant was accompanied during restroom breaks, although given an innocuous explanation, is also to be considered. While appellant had been told that he was not a suspect at 7:00 p.m., by the beginning of Hidalgo's post-polygraph questioning, it was apparent that appellant had become a suspect. On the other hand, appellant never expressed a desire to leave, and he was not told that he could not leave until around 1:30 a.m.

However, at approximately 1:00 a.m. a significant additional circumstance occurred—appellant admitted that he was present during the murder. After that admission, especially in light of appellant's earlier evasions and inconsistencies, the police had probable cause to arrest. This fact distinguishes the present case from all of the above-cited cases. The idea that a crucial admission could turn a noncustodial encounter into a custodial one was the very issue left open in *Turner* (custody may have occurred after the former employee mentioned the boots, which linked him to the crime). Moreover, appellant's admission in the present case is much more obviously damaging than the defendant's admission in *Turner*. The present case is more like *Ruth v. State*, 645 S.W.2d 432 (Tex.Crim.App.1979), where a pivotal admission established custody. In *Ruth*, the suspect had accompanied the victim to the hospital after the victim had been shot. Police officers encountered the suspect at the hospital and asked what happened. The suspect replied, "I had rather not say." One of the officers then said, "We have got a boy out here shot. I need to find out what happened

to him." After a little hesitation, the suspect began relating what happened saying, "The best of my knowledge, I shot him but it was an accident." *Id.* at 434. The officer continued to question the suspect about where he got the gun but the suspect refused to answer. This refusal was admitted into evidence. This Court reversed, holding that the suspect was in custody from the moment he admitted to the shooting, and any subsequent statements were governed by *Miranda.* *Id.* at 436.

While appellant did not admit to committing the offenses, his admission that he was present during the murders was incriminating, and a reasonable person would have realized the incriminating nature of the admission.[5] Given the length of the interrogation, the existence of factors involving the exercise of police control over appellant (accompanying appellant at restroom breaks, ignoring requests to see his wife), and appellant's damaging admission establishing probable cause to arrest, we believe that "custody" began after appellant admitted to his presence during the murders.

### c. *Scrupulously honored rights?*

In point of error five, appellant claims that his videotaped oral statements and his third written statement were illegally obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He contends that, while in custody, he invoked his right to remain silent and that his invocation was not scrupulously honored. Essentially, he argues that Detective Hidalgo continued to question appellant even after he attempted to cut off questioning.

 If a statement is governed by *Miranda* (i.e. the suspect is in custody), then a failure to cut off questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements inadmissible. *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d

313 (1975). *Sterling v. State,* 830 S.W.2d 114, 116 (Tex.Crim.App.1992), *cert. denied,* 506 U.S. 1035, 113 S.Ct. 816, 121 L.Ed.2d 688 (1992). A law enforcement officer may not continue to question the suspect until the officer succeeds in persuading the suspect to change his mind and talk. *Hearne v. State,* 534 S.W.2d 703 (Tex.Crim.App.1976). But, an officer need not stop his questioning unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks. *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). *See also Dinkins v. State,* 894 S.W.2d 330, 350 (Tex.Crim.App. 1995) and *Coleman v. Singletary,* 30 F.3d 1420, 1424 (11th Cir.1994).

 In the present case, the only statement that might qualify as an invocation of the right to remain silent was the one appellant made after he admitted that he was present during the murders: "I can't say more than that. I need to rest." This statement is not an unambiguous invocation of the right to remain silent. Appellant's statement merely indicates that he believed he was physically unable to continue—not that he desired to quit. Further, even if we examined other statements made before appellant was in custody, those statements also suffer the same ambiguity. Finally, at the motion to suppress hearing appellant testified that he did not exercise his right to remain silent. Under these circumstances, appellant's invocation of his right to remain silent was ambiguous, and Hidalgo did not violate appellant's rights by continuing the interrogation.

### d. *Inadequate warnings?*

In point of error six, appellant argues that he was not adequately warned of his rights under *Miranda* and Article 38.22. He concedes that Hendricks gave the proper warnings before conducting the polygraph examination. Although appellant's point of error is somewhat ambiguous, he appears to be advancing the contention he made at trial that

---

5. Hidalgo testified that he would have permitted appellant to leave before the admission but not afterwards. At the time, Hidalgo had no information linking appellant to the murders other than appellant's statements to the officers. While Hidalgo's uncommunicated, subjective belief is not itself relevant to a determination of probable cause, that belief appears to accurately reflect what a reasonable person in appellant's position would have believed under these circumstances.

Detective Hidalgo's questioning constituted a separate interrogation and required another set of warnings.[6]

We can find nothing in federal case law that requires the person conducting the interrogation to be the same person who gives the *Miranda* warnings. However, Article 38.22 § 2(a) does contain a requirement that certain warnings must be given either by a magistrate or "from the person to whom the statement is made." We have held that this requirement is satisfied so long as the officer taking the confession was present when the warnings were given. *Lugo–Lugo v. State*, 650 S.W.2d 72, 82–83 (Tex.Crim.App.1983). *Moon v. State*, 607 S.W.2d 569, 572 (Tex. Crim.App.1980). *Maloy v. State*, 582 S.W.2d 125, 129 (Tex.Crim.App.1979). At trial, the parties disputed whether or not Hidalgo was present when Hendricks gave the warnings. Assuming arguendo that Hidalgo was not present, we nevertheless resolve appellant's Article 38.22 claim against him.

▮▮▮▮▮ First, we address his claim in the context of the videotaped oral statements. We hold that the language in Article 38.22 § 2(a), requiring warnings to be given by the person "to whom the statement is made," does not apply to oral statements but applies only to written statements. In reaching this conclusion, we follow the rules of statutory construction. When a statute is clear and unambiguous, we apply the plain meaning of its words. *Boykin v. State*, 818 S.W.2d 782, 785–786 & 786 n. 4 (Tex.Crim.App.1991). In determining plain meaning, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and usage." TEX. GOV'T CODE § 311.011(a).[7] In addition, we presume that "the entire statute is intended to be effective." TEX. GOV'T CODE § 311.021(2). Every word in a statute has been used for a purpose and each word, phrase, clause, and sentence should be given effect if reasonably possible. *Morter v. State*, 551 S.W.2d 715,

718 (Tex.Crim.App.1977), *quoting Eddins–Walcher Butane Co. v. Calvert*, 156 Tex. 587, 591, 298 S.W.2d 93, 96 (1957).

By its terms, § 2 applies solely to written statements. Oral statements are governed by § 3 of the Article, and § 3 does not contain the language in question. While § 3 requires that the warnings contained in § 2(a) be given, it does not require that all provisions of § 2(a) be met. *See* Article 38.22 § 3(a)(2). § 3 contains its own unique safeguards for an accused. *See* Article 38.22 § 3(a)(1)-(5) & (c). Most significantly, the oral statement must be electronically recorded and the warnings must be contained in the recording. Article 38.22 § 3(a)(1) & (2).

Moreover, § 3 duplicates the "knowingly, intelligently, and voluntarily" language found in § 2. Compare § 2(b) and § 3(a)(2). The only language in § 2 that is not expressly duplicated or incorporated into § 3 is the language in the text of § 2(a) proper concerning who provides the warnings. If the legislature intended for all of the § 2 requirements to apply to oral statements governed by § 3, it could have simply incorporated § 2 wholesale into § 3. It did not. Thus, the language in § 2(a) concerning who may give the warnings does not apply to oral statements, which are governed by § 3.

▮▮▮▮ As for appellant's third written statement, he made the statement to Detective Hidalgo, and Hidalgo gave the appropriate warnings before appellant signed the statement. Appellant contends that warnings should have been given before Hidalgo began the unrecorded interrogation leading to the written statement. Appellant concedes that we have already decided this claim against him. Because a written statement is not "obtained" (because it is not admissible) until it is signed, giving the required warnings before the accused signs the statement meets the statutory requirements. *Allridge*

---

6. The trial court found that the polygraph examination by Hendricks and Hidalgo's questioning constituted a single, continuous interrogation. This fact finding is supported by the record.

7. This provision is part of the "Code Construction Act," which applies to the Code of Criminal Procedure, at least to the extent it has been

amended or reenacted by the 60th or subsequent legislature. Tex. Gov't Code § 311.002(2). *Postell v. State*, 693 S.W.2d 462, 464 (Tex.Crim.App. 1985). *Barbee v. State*, 432 S.W.2d 78, 82 (Tex. Crim.App.1968), *cert. denied*, 395 U.S. 924, 89 S.Ct. 1779, 23 L.Ed.2d 241 (1969).

*v. State,* 762 S.W.2d 146, 157–158 (Tex.Crim. App.1988), *cert. denied,* 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989). Appellant argues that *Allridge* does not take into account the fact that oral statements may be admissible for impeachment and under certain limited circumstances found in Article 38.22 § 3(c). He claims that what is spoken before the signing ceremony is important. But, appellant's logic does not hold because oral statements meeting those conditions would be admissible even under appellant's interpretation of the statute (assuming the federal constitutional requirements in *Miranda* are met). They would not, however, be *written* statements. Appellant's argument for abandoning *Allridge* is not persuasive. The warnings given in the present case were both constitutionally and statutorily adequate.

### e. *Illegal arrest?*

In point of error seven, appellant contends that his videotaped oral statements and his third written statement were the products of an illegal warrantless arrest in violation of Texas statute. We analyze the issue in light of an arrest occurring after appellant's admission to being present during the murders.[8] Appellant argues that his arrest did not fall within one of the warrantless arrest exceptions found in Article 14 and that the taint of the illegality was not sufficiently attenuated.

 The only potentially applicable warrantless arrest exception is the felony/escape rule found in Article 14.04.[9] We have held that Article 14.04 must be strictly construed in the suspect's favor. *Dejarnette v. State,* 732 S.W.2d 346, 349 (Tex.Crim.App.1987). One requirement of the statute is that the law enforcement officer must have "some evidence amounting to satisfactory proof ... that the defendant was about to escape."

*Dejarnette,* 732 S.W.2d at 351 (ellipse added). The escape requirement is obviously met where the suspect has previously fled or otherwise evidences an intention to flee. *Fearance,* 771 S.W.2d at 510. *See also Allridge v. State,* 850 S.W.2d 471, 492 (Tex. Crim.App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). In interpreting ambiguous behavior by a suspect, "it is important to keep in mind the 'temporal proximity' of the actions of [the] suspect both to the commission of the crime, and to the suspect's discovery of the police investigation of him." *Allridge,* 850 S.W.2d at 491. But, satisfactory proof of escape is not established by the mere fact that a suspect travels from one place to another. *Stanton v. State,* 743 S.W.2d 233, 236 (Tex.Crim.App.1988)(driving away from home).

 Moreover, we have emphasized that the escape requirement is not met merely because the police confront the suspect with their suspicions. *Dejarnette,* 732 S.W.2d at 352. Discovery of pursuit is but a factor in the overall picture, and the police/suspect confrontation is not sufficient in itself to constitute satisfactory proof of escape. *Id.* When the proof of imminent escape consists solely of observations by law enforcement personnel, we have generally required that those observations include evidence of some act *by the suspect* tending to show an intent to escape. In *Bell v. State,* 724 S.W.2d 780 (Tex.Crim.App.1986), *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987), we held that the escape requirement was not met where a suspect had been warned earlier in the day that the police were looking for him but was nevertheless drinking at a bar at 12:30 a.m. *Id.* at 787. The fact that the bar was going to close at 1:00 a.m., and the police did not know where to find the suspect after

---

8. We express no opinion as to whether an "arrest" under Texas statutes, *see* Article 15.22, will always occur at the same time "custody" under *Miranda* (or Article 38.22) begins. Appellant was clearly under arrest before his third written statement (occurring after Hidalgo's express statement that appellant was not going home). We will assume, without deciding, that appellant was also under arrest during the custodial portions of his videotaped oral statements.

9. Article 14.04 provides:

> Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused.

the bar closed, was not enough to show satisfactory proof of imminent escape. *Id.*

■ One week elapsed between the commission of the crime and the interrogation of appellant. There was no evidence of imminent escape apart from the observations of law enforcement officials. Therefore, in order for the arrest to be legal, law enforcement officials must have observed some act or acts by appellant indicating an intent to escape which, combined with other circumstances, constituted satisfactory proof that escape was imminent.

After examining the record, we can find no act by appellant indicating an intent to escape. Appellant voluntarily appeared at the police station in the morning and after lunch. He remained at the station for questioning for six hours and then agreed to submit to a polygraph examination, which lasted another four hours. After the polygraph examination, he continued to participate in the police interrogation despite the lateness of the hour. In fact, appellant appears to have exhibited extraordinary patience with the police investigation. The officers did not have satisfactory proof of escape.

An exception to our general requirement of an act by the suspect indicating an intent to escape is found in *West v. State,* 720 S.W.2d 511 (Tex.Crim.App.1986)(plurality opinion), *cert. denied,* 481 U.S. 1072, 107 S.Ct. 2470, 95 L.Ed.2d 878 (1987). In *West,* police officers were called to the scene of a murder after witnesses had reported hearing loud noises in an apartment complex. *Id.* at 512. After discovering the victim's body, one of the officers talked with the witnesses. *Id.* After hearing the loud noises, the witnesses had seen a man, whose clothes were wet with blood, exit the victim's apartment. *Id.* Another person believed she recognized the man described by the witnesses and led the police to his apartment. *Id.* at 512–513. The police knocked on the door, which was opened by the suspect's companion. *Id.* at 513. The police saw the suspect, eight feet away, wearing only a pair of shorts. *Id.* After ascertaining that the suspect matched the description given by the witnesses, the police arrested him. *Id.* We held that the warrantless arrest was proper under Article

14.04, despite the absence of any act by the suspect tending to show an intent to escape, because of the narrow circumstances present:

> We hold that where, as in the instant case, officers who reasonably believe that further investigation of an offense may be necessary in order to justify the issuance of a warrant, and where those officers undertake that investigation lawfully and without impinging upon reasonable expectations of privacy, and where that investigation leads to the receipt of information which in combination with their other information constitutes probable cause to arrest the suspect, but that information is obtained in the presence of the suspect under circumstances which would lead the officers reasonably to believe that the suspect would take flight if given the opportunity to do so, the officers are authorized by Article 14 to arrest the suspect without first procuring a warrant.

*Id.* at 518.

In *West* the lack of an act by the suspect indicating intent to escape was excused because of the circumstances under which probable cause to arrest arose. The inference of intent to escape was reasonable, despite the lack of an overt act by the suspect.

In the present case, as in *West,* officers undertook their investigation lawfully, the investigation led to receipt of information establishing probable cause to arrest, and the information was obtained in the presence of the suspect. Were those the only requirements of *West,* appellant's arrest would have been justified. But *West* also requires that the circumstances be such that they would lead the officers reasonably to believe that the suspect would take flight if given the opportunity to do so.

The evidence in this case shows not just the lack of an overt act by appellant indicating intent to escape, but acts that contradict such an intent. Unless we are to hold that a warrantless arrest is justified under Art. 14.04 *whenever* probable cause to arrest develops in the presence of a suspect, we cannot disregard circumstances that negate an intent to escape. Given the particular circumstances present in this case, the police

could not reasonably "believe that the suspect would take flight if given the opportunity to do so." Hence, Article 14.04 was not met, and appellant's arrest was illegal.

■ Our inquiry does not end here: even though the arrest was illegal, appellant's statements were still admissible if the taint between the arrest and the evidence was sufficiently attenuated. For illegal arrests under state law, Texas applies the four-factor attenuation test found in *Brown v. Illinois,* 422 U.S. 590, 603–604, 95 S.Ct. 2254, 2261–2262, 45 L.Ed.2d 416 (1975):

(1) whether *Miranda* warnings were given,

(2) the temporal proximity of the arrest and the confession

(3) the presence of intervening circumstances, and

(4) the purpose and flagrancy of the official misconduct.

*Bell,* 724 S.W.2d at 788. *Self v. State,* 709 S.W.2d 662, 666 (Tex.Crim.App.1986).

In *Brown,* the Supreme Court concluded that there was not sufficient attenuation of the taint. The suspect's first statement was obtained within two hours after arrest, and the second statement was clearly a result of the first statement. *Id.* at 604, 95 S.Ct. at 2262. The Court held that the illegality had a purposefulness. "The arrest in both design and execution, was investigatory." *Id.* The manner in which the arrest was effected gave the appearance of having been calculated to cause surprise, fright, and confusion. *Id.*

This Court has decided two cases addressing the attenuation question in the context of illegal warrantless arrests under state law. The cases, *Bell* (first confession) and *Self,* appear to involve indistinguishable fact situations but reach divergent results. In both cases, *Miranda* warnings were given repeatedly. *Bell,* 724 S.W.2d at 788. *Self,* 709 S.W.2d at 666. The arrest preceded interrogation, and the temporal proximity between the arrest and the confession was close—between one and one-half to three hours. *Bell.* *Self.* There were no significant intervening circumstances. *Bell,* 724 S.W.2d at 788–789. *Self,* 709 S.W.2d at 666–667. Likewise, in both cases, we found that the conduct was not purposeful and flagrant (the arrests were not calculated to cause surprise, fright and confusion), and in fact, the arresting officers had probable cause—the illegality was not constitutional in nature but stemmed solely from state statutory grounds. *Bell,* 724 S.W.2d at 790. *Self,* 709 S.W.2d at 667–668.

But, while the cases appear to be identical in all relevant respects, they reach different results: *Self* found that the taint was sufficiently attenuated while *Bell* held that it was not. One court of appeals even concluded that *Bell* had implicitly overruled *Self. Stanton v. State,* 750 S.W.2d 375, 378 (Tex.App.— Fort Worth 1988). That conclusion, however, is belied by our holding in *Brick v. State,* 738 S.W.2d 676 (Tex.Crim.App.1987), *cert. denied,* 498 U.S. 818, 111 S.Ct. 63, 112 L.Ed.2d 38 (1990), where we cited both *Bell* and *Self,* and explained that "if the illegality, if any, rests alone upon the violation of the statute, this may well influence ... the assessment of the purposefulness and flagrancy of the police conduct, and, all other factors weighing equally, could ultimately tip the balance." *Brick,* 738 S.W.2d at 681 (ellipse added).[10] The differing decisions in these cases may simply underscore that the fact situation confronted posed a "close question." *See Self,* 709 S.W.2d at 668.

We need not resolve the conflict between *Bell* and *Self* because the present case compares favorably to both. In the present case, as in *Bell* and *Self, Miranda* warnings were given, the proximity between arrest and confession was close, and there were no intervening circumstances. But, the fourth prong, the purpose and flagrancy of the

10. To complicate matters, in a later decision, with facts similar to *Bell* and *Self,* we held that the taint was not sufficiently attenuated as to an oral confession. *Jones v. State,* 833 S.W.2d 118, 126 (Tex.Crim.App.1992). The confession was procured after an arrest based upon an inadequate warrant. *Id.* While the facts appear to be otherwise similar to *Bell* and *Self,* the Court did not specify whether its holding was based upon federal or state grounds. Moreover, while the ruling appears in line with *Bell,* the Court also cited *Self* in connection with the attenuation discussion. *Id.*

conduct, weighs more heavily in favor of the State here than in *Bell* and *Self.* In those cases, the interrogation was custodial when it began. By contrast, the interrogation in the present case began as noncustodial. Moreover, appellant initiated the encounter by returning after lunch to correct his false alibi. The suspicion that appellant was hiding something grew gradually during the interrogation as time passed. Law enforcement agents understandably wanted to continue investigating as they were confronted initially with inconsistencies between appellant's first and second statements and later with the results of the polygraph examination, tending to show that appellant's answers were deceptive. The immediate event triggering custody was not police conduct but appellant's crucial admission, which, when combined with the other circumstances of the interrogation, would lead a reasonable person to believe he was no longer free to leave but was under arrest. This is a moment in time that could have slipped by easily during the interrogation, and to some extent, there was a continuity between the noncustodial and custodial portions of the interrogation that would have been interrupted by an attempt to secure a warrant. Permitting this moment to slip by is more easily understood in the present case than it would have been if the interrogation had begun after an illegal arrest.

Further, in *Bell* and *Self,* the suspects were expressly arrested before the interrogations. But in the present case, the custodial portions of the videotaped oral statements admitted into evidence at trial occurred before appellant was expressly informed of his custody status. And, after appellant admitted he was present during the murders, Hidalgo and Hendricks made encouraging statements, expressing a belief in appellant's innocence of the crime. Even if these statements were psychological manipulation, instead of exploiting appellant's custody status, these statements involved *distancing* appellant from his custody status—the officers attempted to maintain a noncustodial atmosphere. Instead of attempting to surprise, frighten, and confuse, as the officers did in *Brown,* the detectives in the present case were attempting to do the opposite—to assure and mollify.

Finally, the custodial statements appeared to flow as much from appellant's precustodial admission to being present at the murders as from his custody status. Appellant's oral explanations and his later written statement about the details of his observations during the crimes were a natural outgrowth of his precustodial admission. In *Bell,* we noted that a custodial confession may sometimes be motivated by a precustodial event, such as a visit to a minister. 724 S.W.2d at 788 n. 4. While a motivating precustodial event may not technically be an "intervening circumstance" as it does not come between the arrest and the statement, it is similar in that such an event is a circumstance apart from the arrest. The custodial statements in the present case resulted from a legally obtained, noncustodial admission. Under the circumstances, we find the taint between the arrest and appellant's custodial statements to be sufficiently attenuated.

### f. Videotape versus testimony

In point of error eight, appellant complains that the trial court erred by refusing to limit the presentation of his recorded oral statements to playback of the videotapes. At trial, appellant objected to playing the videotapes because they showed the polygraph machine. Appellant further objected that Article 38.22 precluded the use of any method of proving the oral statements other than the recording. In essence, appellant attempted to exclude the oral conversations altogether by placing the trial court in a "Catch 22" situation: the video cannot be admitted because it shows the polygraph machine, but the statements can only be admitted through the video.

Appellant's "Catch 22" argument fails. Article 38.22 does not restrict the method of admitting oral statements of the accused into evidence to the electronic recordings that are made. The statute merely requires that an electronic recording be made and that the recording be preserved until appeals are exhausted. *See* Article

38.22 § 3(a)(1) & (b). Moreover, appellant failed to advance an alternative that would have avoided the supposed "Catch 22," e.g., playing the audio portion of the tape without the video (placing a blanket over the television screen would have accomplished this purpose).

### g. *Harmless error*

 Even if there were error in the admission of appellant's statements into evidence, any such error would be harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Tex.R.App. P. 81(b)(2). Miranda and Article 38.22 apply only to custodial interrogation. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. Article 38.22 § 5. The admission by appellant that he was present during the murders was noncustodial. This admission was a crucial, damaging piece of evidence against appellant. The remainder of the oral interview with Hidalgo merely developed the details of what appellant observed while he was present. Compared to appellant's admission that he was there, the details of what occurred while he was there appear to have little incriminating value. At most, inconsistencies between the details given by appellant and the forensic evidence might reflect on appellant's credibility. However, appellant's credibility was already severely damaged by the inconsistencies between his first and second written statements (false alibi), along with the inconsistencies between those statements and his admission that he was present during the crime. Likewise, appellant's third written statement was merely cumulative of the details given during the videotaped oral statements. Appellant never admitted to committing the murders. The only arguable example of such an admission, appellant's statement that he had "convicted" himself, was never presented to the jury.

Moreover, the physical evidence strongly connects appellant to the murders without regard to any inconsistencies in his statements. Appellant's fingerprint was found on a beer bottle that had the victim's blood on it, and the murder weapon was a distinctive knife carried by appellant. Points of error five through eight are overruled.

### 4. Prior consistent statement

#### a. *Admissibility*

 In point of error eleven, appellant claims that the trial court erred by admitting into evidence a prior consistent statement made by Delton. Delton testified in the case pursuant to a plea agreement. The agreement required that Delton testify "truthfully" against his father. In exchange, Delton pled guilty to one murder charge, received a 45–year sentence, and the second murder charge was dismissed.

Delton testified that appellant killed Gracie. During cross-examination, defense counsel questioned Delton about the details of the plea agreement. Defense counsel specifically asked Delton if the agreement called for him to testify "truthfully" and that "truthfully" meant against his father. Subsequently, the State introduced the testimony of Jimmy Jones, Delton's attorney. Jones testified that, before a plea bargain existed, Delton told him in confidence that appellant killed Gracie. Appellant argues that Delton's statement to his attorney was not admissible because it was made after the motive to fabricate arose. We disagree.

 Under Tex.R.Crim. Ev. 801(e)(1)(B), the prior consistent statement of a witness is admissible to rebut an express or implied charge of recent fabrication or improper influence or motive if the statement was made before the motive to fabricate arose. *Moody v. State*, 827 S.W.2d at 894 n. 11. *Haughton v. State*, 805 S.W.2d 405, 408 (Tex.Crim.App. 1990). In *Moody*, the alleged improper influence/motive was that the mother prodded her daughter into lying about being sexually assaulted by the defendant. 827 S.W.2d at 894 n. 11. The State introduced statements made by the daughter to her father before she had informed her mother of the allegations, so that her statements to her father were made before the motive (her mother's urgings) to fabricate arose. *Id.*

 In the present case, a motive for Delton to fabricate arose at the time of and by the fact of the plea bargain. This mo-

tive—the opportunity to secure a favorable plea bargain—was explored in questioning by defense counsel. Because Delton's prior consistent statement occurred before the plea bargain, it was made before the motive arose in accordance with Rule 801(e)(1)(B). While appellant suggests that a motive to fabricate may also have arisen because of the fact that appellant was criminally charged, in order to satisfy Rule 801(e)(1)(B) it is not necessary that a prior consistent statement have been made before *all* motives to fabricate arose. The rule requires merely that the witness' prior consistent statement be offered "to rebut *an* express or implied charge against him of recent fabrication or improper influence or motive." In this case, cross-examination raised an implied charge that Delton fabricated his testimony specifically because of the plea bargain. Evidence of the prior statement rebutted that particular charge. Point of error eleven is overruled.

### b. *Limiting instruction*

■ In point of error ten, appellant claims that the trial court erred by refusing to grant a mistrial after giving a limiting instruction concerning the prior consistent statements related by Jones. Appellant and the State agreed to an instruction that Jones' testimony should not be considered for the truth of the matters asserted. The following occurred immediately prior to Jones' testimony:

COURT: All right. This testimony is relating to statements, alleged statements that are consistent with the young Dowthitt's in-court statements as an aid, if it does aid you, in passing on whether or not the in-court statement is true or false.

DEFENSE: Judge, I object to that respectfully, with all due consideration to the Court, but that is specifically what they are not to consider it for.

COURT: How do you want . . .

DEFENSE: The testimony of Mr. Jones with regards to prior consistent statements of Delton Dowthitt can be admitted for the limited purpose of showing that he made such statements and specifically cannot be considered as any evidence with regards to the truth contained in those statements.

COURT: Very well. You are so instructed. You may proceed.

Appellant then requested a mistrial, which was denied.

Appellant claims that the first instruction was so poisonous and incorrect that the corrected instruction did not cure the error. Appellant also claims that the trial court never gave a correct limiting instruction.

Appellant appears to be under the impression that the trial court's original instruction called for the jury to evaluate the truth of the prior consistent statements—the exact opposite of what the limiting instruction was supposed to say. Appellant is simply mistaken. The trial court's original instruction told the jury that the prior consistent statements were an aid "in passing on whether or not the *in-court statement* is true or false." That is a correct (though perhaps not complete) statement of the law. The trial court never said that the out-of-court statements should be judged for their *own* truth or falsity.

Appellant was perhaps entitled to a clearer and more complete limiting instruction. But, appellant requested a more complete instruction and the trial court granted it. Under those circumstances the instruction cures the error unless the error is of such a character as to suggest the impossibility of withdrawing the erroneous impression. *Moore v. State*, 882 S.W.2d 844, 847 (Tex.Crim.App. 1994). In *Hughes v. State*, 878 S.W.2d 142, 157 (Tex.Crim.App.1992), a prosecutor made an erroneous statement that it was "wrong for the defense attorneys to put the victim on trial." The trial judge erroneously overruled the instruction. The prosecutor, in a possible attempt to "apologize," stated that the attorneys did nothing wrong, "It's their job. It doesn't mean it's the right thing to do." This time, the trial court sustained the objection and instructed the jury to "disregard the last remark of the prosecutor and not to consider it for any purpose whatsoever." *Id.* We held that the record supported the inference that the trial court realized its error in overruling the objection to the first remark and that the instruction on the second remark also cured the trial court's error in

overruling the objection to the first remark. *Id.*

In the present case, the trial court "corrected" its instruction in response to defense counsel's objection, curing any error. Because the first instruction was not affirmatively incorrect, but merely (possibly) incomplete, it was not of such a character as to suggest the impossibility of withdrawing an erroneous impression. As for the claim that the trial court never gave a correct instruction, it gave the exact instruction requested by appellant. While we can see nothing erroneous about appellant's requested instruction, even if the instruction were incorrect, appellant had the opportunity to request a correct instruction and cannot now complain. The party opposing admission of evidence has the burden, where the evidence is offered and admitted for a limited purpose, of requesting a correct limiting instruction. *Webb v. State,* 760 S.W.2d 263, 275 (Tex.Crim.App. 1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989). Point of error ten is overruled.

### 5. Alleged intimidation of defense witness

In points of error thirteen and fourteen, appellant claims that the State intimidated a defense witness into refusing to testify in violation of due process, the right to a fair trial, and the compulsory process of witnesses.[11] Appellant specifically complains that state investigators frightened David Tipps, a potential defense witness, with threats of perjury. Tipps had given a statement to defense counsel that Delton admitted to committing the offense alone. According to Tipps' statement, Delton said he killed the girls because he was mad at Gracie for being pregnant.

An investigator for the prosecutor's office and Detective Hidalgo visited Tipps in jail, where Tipps was being held on a motion to revoke probation. The investigator introduced himself as an investigator for the pros-

ecutor's office and Hidalgo was introduced as an investigator for the Sheriff's office. At first, Tipps believed that he was in trouble, but he was assured that the two men were not there for anything he had done but were investigating the Dowthitt case. According to the prosecutor's investigator, the topic of perjury was mentioned only once, and this was done by the investigator himself. The investigator told Tipps that if he were telling the truth, there was no problem. But, if they found out that Tipps had lied and were able to prove that he lied, then they would try to pursue perjury charges against him. Tipps also told the investigators that he was afraid of being labeled a "snitch." At trial, Tipps invoked his Fifth Amendment rights and refused to answer questions. The trial court ordered Tipps to testify. Tipps refused and was held in contempt. After being held in contempt, Tipps said "thank you" and continued to refuse to testify.

In analyzing whether appellant's rights were violated, three cases are instructive. In *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), the Supreme Court addressed a situation in which a trial judge threatened the only defense witness with penalties of perjury as the witness got on the stand right before the witness was to testify. The trial court admonished the witness as follows:

> Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the likelihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to

---

11. Appellant relies upon federal due process, Art. I, § 10 of the Texas constitution, and Tex. Pen.Code § 36.05. Although appellant makes a separate argument, he does not explain how the protection offered by the Texas Constitution or statutes differs from that of the United States Constitution. We therefore address only the federal claim. *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim.App.1992), *cert. denied,* 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993).

serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

*Id.* at 95–96, 93 S.Ct. at 352. The defendant's counsel then objected to these comments on the ground that the judge was exerting on the mind of the witness such duress that the witness could not freely and voluntarily decide whether or not to testify on the defendant's behalf thereby depriving defendant of his defense by coercing the only defense witness into refusing to testify. *Id.* at 96, 93 S.Ct. at 352–353. None of the witnesses for the State had been given this admonishment. *Id.* Defense counsel then indicated that he was nonetheless going to ask the witness to take the stand, and the judge interrupted: "Counsel, you can state the facts, nobody is going to dispute it. Let him decline to testify." *Id.* he witness then refused to testify and he was excused by the court. *Id.* The defendant's motion for mistrial was overruled. *Id.* The Supreme Court held that the trial judge's remarks violated the defendant's due process rights. The Court stated that the fact that the witness had appeared in court to testify, refusing to do so only after the judge's warning, strongly suggested that the judge's comments were the cause of the witness' refusal. *Id.* at 97, 93 S.Ct. at 353. The Court further stated that the trial judge had gratuitously singled out this witness for a lengthy admonition on the dangers of perjury. *Id.* The Court stated that the judge had implied that he expected the witness to lie, and went on to assure the witness that if he lied, he would be prosecuted for perjury, the conviction added to his present sentence, and the result would be to impair his chances for parole. *Id.* The Court held that while some of the threats may have been beyond the power of this judge to carry out, the great disparity of

posture between presiding judge and witness in these circumstances, coupled with the unnecessarily strong terms used by the judge, could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify. *Id.* at 98, 93 S.Ct. at 353–354.

In a different case, *Webb v. State,* 503 S.W.2d 799 (Tex.Crim.App.1974), this Court confronted another "perjury threat" situation after the Supreme Court's decision. A 15–year–old witness denied the truthfulness of a prior statement. The court admonished her that she could be prosecuted for not telling the truth. The witness continued to testify. *Id.* at 801. No objection was lodged to the trial court's remarks. *Id.* We held that no reversible error was shown.

In *Davis v. State,* 831 S.W.2d 426 (Tex. App.—Austin 1992, pet. ref'd), a witness gave exculpatory testimony on behalf of the defendant. Later that day, the prosecutor asked an officer to contact the witness and have her call his office. When the witness arrived at the prosecutor's office, the prosecutor told her there was a conflict between her testimony and that of other witnesses; that if he could not resolve this conflict he would present the matter to the grand jury; and that if the officers had lied he would indict them, or "the reverse if she had not told the truth." He also told her that he had "already put one person in jail for lying on the stand last year." He then asked her if she might have been mistaken about her testimony. She said she had been mistaken. The prosecutor recalled her the next day and she recanted her earlier testimony. The prosecutor's line of questioning made it appear that she had initiated the contact leading to her recanting her testimony. In a hearing on motion for mistrial outside the presence of the jury, the prosecutor testified in conformance with the above information. The witness was called back to the stand, told by the trial court that she now had judicial immunity from prosecution for perjury and assured her that she was not going to jail. The witness then stated that she had changed her story because she was intimidated by the threats made by the prosecutor and she was so distraught about the matter that she was suffering physically.

*Id.* at 436. The trial court denied the motion for mistrial but instructed the jury to disregard the second round of the witness' testimony. *Id.* at 437. The court of appeals held that the mistrial should have been granted. The court held that while it was not *per se* improper to advise prospective witnesses of the penalties for testifying falsely, warnings of the penalties of perjury cannot be emphasized to the point where they threaten and intimidate a witness into refusing to testify. *Id.* at 437–438. The court of appeals held that the prosecutor's actions went far beyond a cautious and judicious warning. *Id.* at 438. It was outside the supervision of the trial court in the intimidating environment of the prosecutor's office, and the tenor of the prosecutor's comments were more threatening than necessary, especially the comment about "putting one person in jail," which seemed designed to intimidate. *Id.* at 438. Further, it was shown that the witness did in fact change her testimony as a result of the prosecutor's actions. *Id.* Finally, the prosecutor's procurement of the intimidation-based second round of testimony constituted the knowing use of perjured testimony—itself a due process violation. *Id.* at 439. The trial court's instruction did not cure the error because the instruction to disregard the second round of testimony might also have led the jury to conclude that the witness was not credible and to disregard all of her testimony, including that which was exculpatory for the defendant. *Id.* at 439.

The present case falls somewhere in between *Webb v. Texas* and *Davis,* on the one hand, and *Webb v. State* on the other. As in *Webb v. Texas* and *Davis,* the interview took place in a setting favorable to the authorities and possibly conducive to intimidation—the jailhouse. Moreover, the investigator did tell the witness that he *would* go after him for perjury (if he were lying and that could be proven) rather than making a more abstract "you could be prosecuted for perjury" statement. Further, the witness was in a precarious position because of the pendency of his parole revocation proceedings. And finally, as in *Webb v. Texas,* the witness in the present case refused to testify.

But, the present case also contains factors that distinguish it from *Webb v. Texas* and *Davis.* The investigator possessed less apparent power than the judge or the prosecutor in the former cases. Unlike the prosecutor in *Davis,* the investigator did not brag about his power to carry through his threats. Unlike the judge in *Webb v. Texas,* the investigator did not convey the impression that he would know whether or not Tipps was lying. In fact, the investigator admitted that he was limited by what he could prove. Moreover, the investigator's warning appears to be significantly shorter and less threatening than the warnings in *Webb v. Texas* and *Davis.*

Perhaps more importantly, Tipps expressed fears of being called a "snitch;" so, his reason for refusing to testify may not have been based on a fear of prosecution for perjury. Unlike *Webb v. Texas,* Tipps did not come to the courthouse expecting to testify, and unlike *Davis,* he did not say that his refusal to testify was a result of perjury threats. In fact, the trial judge ordered him to testify and upon refusal held him in contempt. If Tipps were concerned about jail time, the contempt threat should have been an incentive to testify. But, his responses indicate that being held in contempt did not bother him. This lack of concern tends to support the "snitch" explanation as more accurate. We believe that the facts of the present case sufficiently distinguish it from *Webb v. Texas* and *Davis.* Points of error thirteen and fourteen are overruled.

The judgment of the trial court is AFFIRMED.

CLINTON and OVERSTREET, JJ., concur in the result.

BAIRD, J., concurs with a note: The seventh point of error contends the oral and written statements were the product of an illegal arrest and the majority agrees. *Ante,* 931 S.W.2d at 261. The majority then holds the taint of the illegality was sufficiently attenuated. *Ante,* 931 S.W.2d at 263. I disagree for the reasons stated in *Bell v. State,* 724 S.W.2d 780 (Tex.Cr.App.1986). Nevertheless, I would find the error harmless for the reasons stated in *Boyle v. State,* 820 S.W.2d 122, 149 (Tex.Cr.App.1989) (Op'n

on Reh'g)(Baird, Overstreet and Maloney, JJ., concurring). For these reasons, I join only the judgment of the Court.

MALONEY, Judge, concurring.

I concur in the disposition of points of error six and seven, and otherwise join the opinion of the Court. In his sixth point of error, appellant complains that he did not receive adequate warnings pursuant to Tex. Code Crim. Proc. Ann. art. 38.22, § 3 prior to making his videotaped oral statements. In resolving this point, the majority discusses whether § 3 requires warnings to be given by the individual "to whom the statement is made." This epistle is unnecessary to the disposition of this point of error for two reasons. First, as the majority notes in footnote six, the record supports the trial court's finding that appellant's polygraph examination and Hidalgo's questioning of appellant constituted a single, continuous interrogation. In view of this finding, the warnings administered prior to the polygraph examination, a fact which is undisputed, also extended to the videotaped oral statements. Second, appellant does not argue in his brief that his statement was taken in violation of § 3 because the warnings were not given by the individual "to whom the statement is made." Review of the statement of facts reveal that such an objection was lacking in the trial court as well. I would overrule this point of error by concluding that the record supports the trial court's finding that the warnings appellant received prior to the polygraph examination extended to Hidalgo's interview of appellant.

In point of error seven, appellant alleges that his videotaped oral statements and his third written statement were taken in violation of Texas law because they were the products of an illegal warrantless arrest. I agree with the majority's determination that the arrest was illegal. I further agree with the majority that the error was harmless. In addition to holding the error harmless, however, the majority finds that appellant's statements were admissible because "the taint between the arrest and appellant's custodial statements [was] sufficiently attenuated." *Majority* op. at 262. Discussion of the attenuation doctrine is unnecessary because appellant's incriminating statement was made before the illegal arrest. Nonetheless, the majority relies upon *Bell v. State*, 724 S.W.2d 780, 788 n. 4, for the proposition that "a custodial confession may sometimes be motivated by a precustodial event, ...," which in this case was appellant's precustodial admission to being present at the murder scene. *Majority* op. at 262. The majority's reliance on *Bell* is unpersuasive. The statement in *Bell* is a quote from Justice Stevens' concurring opinion in *Dunaway v. New York*, 442 U.S. 200, 220, 99 S.Ct. 2248, 2260–2261, 60 L.Ed.2d 824 (1979) in the context of a discussion of the vagaries of the "temporal proximity" factor. *Bell*, 724 S.W.2d at 788. The only place this language is found in our caselaw appears in footnote four in *Bell* addressing the same issue.

For the foregoing reasons, I concur only with points of error six and seven, and otherwise join the opinion of the Court.