IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-74,233






ROBERT BURNS SPRINGSTEEN, IV, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM TRAVIS COUNTY





Keller, P.J., filed a dissenting opinion in which Hervey and 

Keasler, JJ. joined. 


 The Court reverses appellant's conviction because of the admission into evidence of Michael
Scott's written statement. I believe that a comprehensive examination of the testimony reveals that,
beyond a reasonable doubt, the admission of Scott's written statement did not contribute to the jury's
conclusion that appellant murdered Amy Ayers. With respect, I dissent.

 Setting aside Scott's statement, the jury had for its consideration appellant's confession that
he committed the crime with Scott, Maurice Pierce, and Forrest Welborn. By itself, a confession 
is a powerful piece of incriminating evidence. I start with the fact that in order to acquit appellant,
the jury would have to disbelieve, or at least have a reasonable doubt about believing, appellant's
own videotaped confession. The Court contends that appellant's repudiation of the confession at
trial "may have more than the usual weight" because many so-called "nonpublic facts" were widely
known and because two other people falsely confessed to the crime. I disagree.

 It is first noteworthy that the September 14, 1999, interview in which appellant's confession
was obtained was electronically recorded on videotape and by audio recording. As a result, the jury
was not confronted with varying stories concerning what actually happened during the interview. 
Instead, the jurors could be confident that the State was correctly presenting what transpired, since
the interview itself was available for review. Appellant was, incidentally, unaware that the interview
was being taped. 

 An examination of that interview reveals that, while officers were firm in pressing for the
truth and for details, no coercion was used, appellant was not threatened in any manner, and no
promises were made. Although the officers often expressed their disbelief regarding appellant's
initially exculpatory answers and they misled appellant by overstating the strength of the evidence
against him (e.g. whether the co-conspirators had implicated him and whether the movie appellant
said he went to see was actually playing that night), these tactics played upon appellant's guilty mind
and were not the kind of tactics that would an inspire an innocent person to confess falsely. (1)

 The fact is, the defense offered no remotely believable motive for appellant to confess falsely
to involvement in the murders. Appellant claimed that he did so because he "just kind of gave up
on [him]self" and believed that the "physical proof" would exonerate him anyway. I can see how
"giving up" might conceivably contribute to a decision to confess induced by, say, threats. But I do
not understand the logic of "giving up" being a stand-alone reason to confess. Regardless, if
appellant truly believed the physical evidence would exonerate him, there was no reason to confess. 
He could have simply walked out. (2) At trial, appellant claimed that he felt that he was not free to
leave because he requested a lawyer near the beginning of the interview and that request was "totally
ignored," but the recorded interview shows otherwise. 

 When the interview began to become accusatorial, appellant said, "If I'm being accused of
something, then I would like a lawyer present," and he stated that he had been questioned over and
over, and "would like this to come to an end . . . one way or the other." One of the officers
responded that they would also like the matter to come to an end and asked, "Are you telling us that
you want a lawyer and you want to leave?" Appellant then asked if there were any charges against
him, and the officer informed him that he was not under arrest and was free to leave any time he
wanted to. Appellant responded that he wanted "to do this the right proper way" but did not ask to
leave or request an attorney, and the questioning continued. So, contrary to appellant's trial
testimony, his inquiry about an attorney was not "totally ignored." In fact, later in the interview,
appellant volunteered that the officers "seem like real nice knock out guys and have been real
friendly and kind" - hardly a description of officers running roughshod over his rights. And the
officers did nothing to contradict their statement that appellant was free to go. There is no indication
that they deprived him of food or denied him breaks, nor is there any indication that he was denied
the ability to contact friends or relatives, or even an attorney, if he so desired. (3) 

 But even if appellant really believed that he was not free to leave, the issue of harm hangs
on whether the jury would have believed the unlikely claim that appellant would implicate himself
in a capital murder for the purpose of shortening a temporary period of detention. There was simply
no reason for the jury to conclude that the confession was anything other than a voluntary and
truthful statement.

 The Court suggests that the existence of other, false, confessions (specifically that of Alex
Briones and Shawn Smith) somehow makes appellant's confession less believable. In an infamous
case such as the "Yogurt Shop Murders," law enforcement may deal with mentally imbalanced
individuals who confess simply as a way of thrusting themselves into the limelight. But limelight-seekers tend to inject themselves into a case during the height of publicity, not years later when the
trail has grown cold. Briones and Smith (4) gave their inculpatory statements in February and March
of 1992, within just a few months of the murders, which occurred in December of 1991. Appellant,
by contrast, denied involvement in the crime when he was interviewed in December of 1991, and
he continued to deny involvement through much of the interview conducted in 1999. At any rate,
appellant never claimed such a motive in his trial testimony.

 There are other reasons, from a motive standpoint, to distinguish appellant's confession from
that of Briones. Briones had been arrested for a San Antonio murder, in which he had raped a
woman and set her on fire. When Austin Police Sergeant Hector Polanco interviewed Briones
regarding the yogurt shop case, it was evident that Briones was going to be convicted of the San
Antonio murder. Briones expressed his desire to be executed because he did not want to "rot" in
prison. Briones was also aware of a $100,000 reward for information leading to the capture of the
participants in the yogurt shop murders. During the interview, he talked quite a bit about the reward
money and asked whether his family would get the reward because they had assisted law
enforcement in locating him. Polanco told him that was a decision to be made by Crime Stoppers,
"but yeah, if it led to the arrest and convictions."

 Moreover, appellant's confession contained a crucial piece of information known only to the
perpetrators and to law enforcement: that a silver .380 automatic was one of the murder weapons. 
The Court makes much of the fact that many nonpublic ("hold-back") facts were actually widely
known. But Sergeant Bruce Boardman testified that "there were two or three things that were still
held close to the vest, so to speak, that would turn the case if the individual came up with the right
answers." Boardman explained that certain detailed information, such as the specific cause of death
or the number of gunshot wounds, were more easily kept secret because they were not the type of
facts that could be ascertained from a casual observation of the crime scene. It was determined that
Amy Ayers was killed by a .380 caliber bullet, which was collected from the scene. (5) A ballistics
analysis of the grooves found on that bullet linked it to one of several .380 automatic models, most
likely an AMT .380 Backup. The ballistics expert testified that all the guns of that model that he had
seen up to the time of the crime were a silver-gray in color, although the color of the handgrips
varied. Whether the gun was silver was not considered to be a hold-back fact because the gun would
either be silver or black, so someone would have a fifty-fifty chance of choosing the correct color. 
But testimony from two different police witnesses, Detective Robert Merrill and Sergeant John
Jones, confirmed that the identity of the gun as a .380 was a closely guarded fact that was never
revealed to anyone outside of law enforcement.

 No evidence at trial suggests that this information was ever leaked. And neither Briones nor
Smith told police that a .380 was used in the offense. Briones characterized the two weapons used
as a black .22 automatic (6) and a chrome .38 automatic. Despite the orthographic similarity between
.38 and .380, they are not the same type of gun. Moreover, Briones characterized the .38 as "pretty
big" but both Detective Merrill and appellant characterized the .380 automatic as a small gun. (7) 
Smith described the two weapons as a silver revolver, smaller than a .357, and a black automatic of
some sort. He gave no caliber ratings for the guns because he claimed that he was unfamiliar with
calibers. 

 But in his confession, appellant characterized the gun he used as a silver .380 automatic, a
piece of information that, in the absence of a really good exculpatory explanation, ties him to the
crime. In attempting at trial to explain his remarkable knowledge of this information, appellant gave
inconsistent and unbelievable stories. When asked during direct examination what basis he had for
telling the police that the gun was a .380, appellant first replied, "I don't know." He then suggested
that he thought of a .380 because a former co-worker possessed a silver .380 for his own protection. 
When pressed further by his own attorney, appellant said that Detective Merrill had told him during
questioning that a large caliber weapon had been used in addition to the .22, that appellant
considered a large caliber to be a .45, a .40, or a 9 millimeter, and that appellant said the gun was a
.380 because he figured that a small caliber such as a .380, a .38, or a .25 would not match the facts
of crime. Contrary to appellant's claim, however, the recording of the interview reveals that
Detective Merrill never made any suggestion regarding the nature of the weapon that killed Amy
Ayers. And appellant did not suggest that the gun was a .38 or a .25; he said it was a .380. When
pressed on the matter during cross-examination, appellant changed his story, replying that it was
"also very possible that during my questioning, either here in Austin or over the phone, that that was
brought up previously." Appellant later agreed that his mention of the .380 was a "guess."

 Strikingly, appellant did not claim that he guessed ".380" because he had previously owned
one. In fact, during his trial testimony, appellant denied that he had ever owned a .380. But James
Ramsbottom, a junior high school acquaintance of appellant's in West Virginia, testified that he saw
appellant in possession of a nickel-plated or chrome-plated .380 firearm with black handgrips.

 Appellant's equivocation regarding the .380 extended also to the question of whether he
owned any firearms at all. In the early part of his 1999 recorded interview, appellant claimed, "I've
never owned a gun." Later, in a gratuitous explanation for why he was shocked by Pierce's conduct
during the incident, appellant stated, "I like guns, I like collecting guns, it's - it's not a toy, in my
opinion." (8) In the course of a single interrogation, appellant went from never owning a gun to being
a gun collector. Although appellant denied at trial that he had ever owned a .380, he conceded that
he had owned guns. When asked at trial about the contradiction in the recorded interview, appellant
attempted to harmonize his earlier statements by saying, "Family members in my family collect guns
that I have access to, but I do not collect guns myself." Of course, appellant denied that any member
of his family had access to a .380. 

 Both the recorded interview and appellant's trial testimony reveal his attempt to distance
himself in any way possible from what he knows is the murder weapon. He has never owned guns,
but he collects them. He does not collect guns, but his family collects them and he has access to
them. He does not know why he said .380 but maybe it is because a he saw a .380 owned by a co-worker. Or perhaps it is because he knows the .380 is a small caliber and the detective said in the
interview that a large caliber was used in the crime, so the .380 could not have been one of the
murder weapons. But the detective did not say a large caliber was used in the crime, so perhaps
appellant was told in a previous conversation that a .380 was one of the murder weapons. But in any
event, appellant never owned a .380, despite the fact that a junior high acquaintance saw him with
one. And his family never owned a .380 either. The mounting contradictions make appellant's
position more and more implausible. The Court's harm analysis does not account for the probable
effect that the contradictions would have had on the jury's determination of whether appellant's
confession was true.

 In addition, appellant's defense was torpedoed by the State's complete dismantling of his
alibi. The murders were believed to have occurred shortly after the shop closed at 11:00 p.m. A
police officer looking for drunk drivers noticed smoke coming out of the yogurt shop and reported
the fire at 11:47 p.m. 

 At trial, appellant testified that he was at Northcross Mall during the relevant period of time. 
Specifically, he claimed that he and Scott arrived at the mall between 10:20 and 10:30 p.m., when
Pierce and Welborn went to pick up Pierce's sister from work. He claimed that he remained at the
mall and sneaked into the movie theater there at midnight to watch the Rocky Horror Picture Show. 
He said that Scott attempted to sneak in also but was apparently caught and waited outside for
appellant until the movie was over. He claimed further that Pierce and Welborn were supposed to
pick them up when the movie ended around 1:30 or 2:00 a.m., but never showed up. Appellant
testified that "an older gentleman" named "Bob or Robert," who had attended the movie, gave him
and Scott a ride, dropping them off near Scott's mother's house, where appellant and Scott spent the
night.

 First, no one confirmed appellant's story at trial. Perhaps it is too much to expect that Scott,
Welborn, or Pierce, who were also accused of this crime, would testify on appellant's behalf, but the
fact remains that they did not. Thomas Powe (whom appellant characterized early in the recorded
interview as his "best friend" while he lived in Austin) also could not confirm appellant's story. 
Powe had heard earlier in the day that appellant was going to be at the mall, so he looked for him
before entering the movie theater but did not see him. (Under cross-examination, Powe conceded
it was possible that appellant could have attended the movie without being seen by him.) Appellant
also failed to secure the testimony of "Bob," who supposedly gave him and Scott a ride to Scott's
mother's house. 

 Second, appellant's alibi was fully refuted by Chandra Morgan, who, at the time of the
murders, was a junior high student who knew Pierce and Welborn. Morgan testified that on the
evening of the murders she met Pierce, Welborn, and two other boys, and consumed "acid" with
them. In court, she identified appellant as one of the other boys. After consuming acid, they got into
a car driven by Pierce and went to the yogurt shop. Welborn stayed outside while the others,
including Morgan, entered the shop. While there, Morgan drank some water, and the boys went to
the restroom. Afterwards, they returned to the mall, and Morgan went to the arcade. Morgan lost
contact with the boys for 30 to 45 minutes, after which they drove up and asked her if she wanted
a ride. As they were driving away, she heard fire engine sirens. She told the boys that she wanted
to see where the fire engines were going, but they continued to drive away from the area until they
reached Gullet Elementary School. Morgan noticed that appellant was carrying a gun in his
waistband. The gun appeared to be a semi-automatic. 

 Morgan's testimony contradicted appellant's alibi by placing him in the company of Pierce
and Welborn at the time of the fire when - according to him - he was at the mall getting ready to
sneak into a movie. Her testimony also contradicted appellant's story about Pierce and Welborn not
showing up after the movie was over, requiring him to hitch a ride with another moviegoer. And,
importantly, her testimony showed that appellant had a semi-automatic handgun that night, a fact that
is too remarkable to be a coincidence.

 Appellant's alibi was also seriously undermined by Scott's admission of guilt. Although
Scott's written confession to law enforcement officials may have been inadmissible, the Court has
acknowledged that Scott's confession of guilt to Amanda Statham was properly admitted as a
statement against interest. The statement to Statham does not contain the amount of detail found in
the written confession, but the bare admission of guilt made by Scott is itself inconsistent with
appellant's story at trial. While appellant's alibi would separate him from Scott for an hour-and-a-half to two hours during the movie, the murders were not committed during that time. The movie
started at midnight, and the yogurt shop was already burning at 11:47 p.m. And in fact, appellant
testified at trial that it was "100 percent correct" that Scott could not have participated in the murders
because he was with appellant at the time. So, if Scott did participate in the murders, appellant's
alibi cannot be true. (9)

 Also, appellant's accomplices had no alibis. Only appellant testified that Scott was
somewhere besides the yogurt shop at the time the murders occurred, and no one provided any sort
of alibi for Welborn and Pierce. By contrast, the person Briones alleged was his co-conspirator had
a rock-solid alibi: he was in prison at the time. And the three other people alleged by Smith to be
involved all testified at trial that they were not involved in the murders.

 Finally, appellant's confession was consistent with the physical evidence at the crime scene,
with Morgan's testimony, and with Scott's admission of guilt to Statham. In other words, the
evidence not only contradicted appellant's exculpatory trial testimony; it supported his videotaped
confession of guilt.

 In summary, appellant confessed. That confession was voluntary. Appellant had no motive
to confess falsely, and there was absolutely no reason for the jury to doubt the truthfulness of the
confession. Appellant knew that a .380 semi-automatic handgun was used in the murders, and this
information was a closely guarded secret known only to law enforcement and the perpetrators. His
various explanations for how he knew that a .380 was used were inconsistent and unbelievable, and
he even contradicted himself on the question of whether he had ever owned guns at all. Appellant
had previously been seen in possession of a .380 semi-automatic handgun, and on the very day of
the murders he was seen in possession of a semi-automatic handgun. Appellant's alibi testimony
was unsupported by other testimony or physical evidence of any kind. It was contradicted by his
own videotaped confession, by Chandra Morgan's testimony, and by Scott's admission to the
murders. Not only are Morgan's testimony and Scott's confession inconsistent with appellant's alibi,
they are consistent with details of appellant's videotaped confession. The two "alternate suspects"
who confessed to involvement in the crime - Briones and Smith - were unaware that a .380 handgun
was used, and they implicated "accomplices" who clearly were not involved. Any error in admitting
Scott's written confession was harmless beyond a reasonable doubt.

 I respectfully dissent.

 Keller, P.J. 

Date filed: May 24, 2006

Do not publish
1. "Of the numerous types of police deception, a misrepresentation relating to an accused's
connection to the crime is the least likely to render a confession involuntary. The police conduct
complained of here, concerning the strength of the prosecution's case against appellant, falls into
this category." Green v. State, 934 S.W.2d 92, 100 (Tex. Crim. App. 1996)(citation omitted),
cert. denied, 520 U.S. 1200 (1997).
2. See Dowthitt v. State, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996), cert. denied, 526
U.S. 1070 (1999)("Stationhouse questioning does not, in and of itself, constitute custody.").
3. See id. at 256-257 (custody occurred as after development of probable cause, where the
length of questioning was extraordinary, the defendant was accompanied on restroom breaks, and
police ignored repeated requests to see wife).
4. Smith's statement was not particularly inculpatory. He claimed that he just tagged
along with three other individuals to watch one of them scare a girl who caused that person to
lose money in a marijuana deal. Smith said that he tied up one of the girls in the yogurt shop but
was completely surprised when the other participants stripped the girls naked, engaged in sexual
assaults, and murdered the victims. 
5. A shell casing for the bullet was retrieved in a later search.
6. The absence of shell casings for the .22 led the police to believe that it was not an
automatic, but a revolver.
7. There was testimony that Briones appeared to lack information on many other facts
relating to the crime. Sergeant Mike Huckabay testified that he was asked to take over the
interview being conducted by Polanco. Polanco objected, but was overruled. When Huckabay
began by asking Briones to tell him about the four girls, Briones expressed surprise, because he
thought there were only three. After more questioning, it became obvious to Huckabay that
Briones "had a lot of the facts wrong." Huckabay then walked outside and told Polanco,
"Hector, this guy don't know jack." Polanco replied, "Let me talk to him some more," and went
back into the interview room. Later, he came out and told Huckabay that Briones was ready, and
at that point Briones gave a written statement. After an internal affairs investigation, Polanco
was taken off the case. That investigation elicited statements from Briones that Polanco had
threatened him and told him what to say. There is nothing in the record to indicate that Polanco
ever interviewed appellant.
8. Emphasis added.
9. There were a few other troubling facts surrounding the incident. Appellant's father
called the police during the day on December 6, 1991 to tell them appellant and Scott (who were
roommates) had been missing since December 4th. In a December 15, 1991 interview with law
enforcement, appellant told the police that he and Pierce had picked up Kelly Hannah
(appellant's girlfriend) sometime during the evening on December 6th. But Hannah testified that
appellant and Pierce were supposed to show up that night but did not.