IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. PD-0862-05






MICHAEL SCOTT, Appellant


v.


THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

FROM THE THIRD COURT OF APPEALS

TRAVIS COUNTY





 Keller, P.J., filed a dissenting opinion in which MEYERS, KEASLER, and
HERVEY, JJ., joined. 



 I turn first to the first "confession" - the various admissions of guilt made by appellant to law
enforcement during interviews conducted in 1999. What reason did he have to confess falsely? In
a case as infamous as the Yogurt Shop Murders, people sometimes come forward and confess falsely
to be in the limelight. But appellant did not seek the limelight. He denied involvement in 1991,
again denied involvement in 1998, and denied involvement during much of the interviews conducted
in 1999. Only after dogged and skillful interrogation were the officers able to slowly draw out the
truth.

 The question then is whether there is any reason to believe that appellant was coerced into
a false confession. Nothing in the record suggests that police officers used any sort of physical
coercion. As the interview continued, police questioning did become more aggressive and officers
progressively engaged in a number of tactics designed to play upon appellant's guilty conscience. 
They hooked him up to a polygraph machine. They threatened to take him before a grand jury,
where he would expose himself to a perjury prosecution if he lied. They told him that they had
talked to all of the other relevant actors and said that Springsteen and Pierce had shifted blame onto
appellant. They indicated that "new technology" had shed additional light on the crime. They
discussed the fact that the victims would never get to go to graduations, dances, and barbecues and
would never get to see boyfriends or get married. And they told appellant that he was a co-conspirator if he did not talk about what he knew and that, because of his involvement, he was
obligated by law to tell the truth about the incident. In engaging in these tactics, the police did
sometimes mislead appellant, but this type of behavior was designed to elicit a truthful confession
by exploiting appellant's own guilty knowledge. (1)

 And although the police interrogation was aggressive, appellant was not in custody. The
significant length of interrogation, lasting on the first day from 9:10 a.m. to 10:22 p.m., was
comparable to what we saw in Dowthitt v. State, (2) but the other factors present in Dowthitt were
absent here. In Dowthitt, the officers engaged in fifteen hours of interrogation. (3) They accompanied
the defendant on restroom breaks and ignored two requests to see his wife. (4) After twelve hours of
interrogation, appellant made a crucial admission that we held was sufficient, given the
accompanying circumstances, to result in custody attaching at that point. (5)

 In the present case, appellant was not accompanied on restroom breaks and was often left
alone on cigarette breaks as well. Officers gave him food and drink, and they permitted him to call
his wife upon request. (6) He was allowed to take breaks when he wished, and he was assured more
than once during the interview that he was not under arrest and could leave at any time he wanted. 
Indeed, when asked by a new officer taking over the interrogation whether he was under arrest,
appellant replied, "As far as I know, I'm not." Appellant was allowed to go home that evening, and
he returned to police headquarters the next day on his own volition. Later on the second day,
appellant reaffirmed the voluntariness of his presence at the station:

Q. Let me ask you this. Is anybody hurting you? Any of us hurting you?


A. Not physically.


Q. Have we done anything to you to make you do something you don't want to do?


A. No.


Q. Have we forced you to stay here?


A. No. I'm here of my own free will.


 Q. And you know you're free to leave anytime you want?


A. Anytime.


Q. And when you go out to smoke, half the time there's no one with you. You go to
the bathroom by yourself. Right?


A. Yeah.


Q. You know you're not under arrest.


A. I'm not.


Q. And we don't want you to feel - I mean, you come and go.


A. I walked up to the front gate and waited on you all. "Come on guys."


So, if appellant believed the police were trying to pressure him into a false confession, he could have
just walked out. 

 The Court faults the police for using leading questions that suggested the answers they
wanted appellant to give. But why would leading questions motivate appellant to confess falsely to
involvement in such a serious crime? Was he such a mentally weak individual that he would agree
to anything suggested, no matter how detrimental such agreement would be to his own self-interest? 
A review of the interrogation itself refutes that notion, as appellant disagreed with many statements
made by the officers. Or can we conclude that appellant was easily led because he lacked the
intelligence to understand the true import of the questions? We cannot, because the interrogation
shows a reasonably astute individual who understood very well what the police were asking him. 
Indeed, many of the so-called leading questions required a degree of intelligence sufficient to read
between the lines to come up with the correct answer. Or can we say that, by suggesting the
"correct" answers, the leading questions corrupted appellant's memory of events? That might be a
valid concern if the case turned on some minuscule detail that appellant recalled inaccurately. But
a leading question should not so massively corrupt appellant's memory as to make him believe he
was involved in a crime that he was not in fact involved in. It is one thing to say that leading
questions may have prompted appellant to recall inaccurately details regarding how the victims were
restrained or how the fire was set, but it is quite another to say that leading questions would cause
him to mistakenly remember being involved in a murder.

 Moreover, several of appellant's incriminating statements were volunteered. Early in the
interview, in an apparent slip of the tongue, he mentioned that the group possessed firearms, when
his original story had been that Pierce possessed the only firearm. Later in the interview, he
volunteered that he lied in a previous interview about seeing a jeep pass by with its lights turned off. 
Even later, after he had acknowledged his presence in the yogurt shop at the time of the murders, he
stated, without prompting, that he set the fire. In addition, he stated, without prompting, that he had
nightmares regarding the incident. And as the Court acknowledges, appellant, without prompting,
quoted one of the victims responding to Pierce's demand for money as follows: "There isn't any
more. They've already made their drop." The incriminating significance of that last statement
should not be minimized. Every night, the yogurt shop's daily revenues were dropped into a floor
safe. No explanation was given for how appellant would know that money would be "dropped" at
the yogurt shop other than his having actually heard the statement during the robbery. Appellant also
knew that a revolver and a small automatic were used in the robbery. While it may be fair to say that
the police questioning was "leading" appellant to the conclusion that two firearms were used,
appellant still had to correctly "guess" that only one of them was a revolver and that the automatic
was a small firearm.

 Also telling was appellant's reaction to the police ruse that Springsteen and Pierce had
blamed him. Appellant stated that they were both liars and that Pierce would "do anything to save
his own ass." Appellant also commented that he believed Springsteen and Pierce were implicating
him in something that they had done. But earlier in the interview (before it became accusatorial),
appellant had already placed himself at the mall in the company of Springsteen and Pierce that
evening, and had already placed himself at home with Springsteen (his roommate) during the time
period in which the murders took place. Pierce's involvement in the murders would tend to be
inconsistent - and Springsteen's involvement would be completely inconsistent - with appellant's
initial exculpatory version of events.

 The second day of the interview showed appellant initially scrambling to deflect the police
investigation from his earlier admissions of guilt. Appellant stated that he had "dug" himself "a
hole" that he did not "know how to get out of." After having a night to sleep on it, appellant had
concocted a new story. He was now sure that he went into the yogurt shop during the robbery, but
he claimed that he did so only after hearing gunshots. He volunteered that this new story was "total
contradictory" to what he said the day before. This new story soon fell apart during the interrogation.

 If the police really had produced a false confession through either coercion or the power of
suggestion, then one would expect the story given during the initial stages of the interview - before
the interview became accusatorial, when the police were simply trying to elicit appellant's version
of the events - to be true. But the story given during the initial stages of the first 1999 interview
contradicted what appellant had told officers a year earlier. 

 In February of 1998, appellant told law enforcement that he was smoking a cigarette outside
Northcross Mall after dark. He claimed that he saw a jeep drive out of the yogurt shop parking lot
with its lights off. He further stated that he left the mall in Pierce's car, possibly with Springsteen
and Welborn, and they drank beer while driving around. Appellant stated that they had seen the
commotion at the yogurt shop and drove away in a different direction because none of them wanted
to have anything to do with the police. Observing the commotion would place appellant and his
friends within the vicinity of the yogurt shop after 11:47 p.m., the time a patrol officer first observed
smoke rising from the building. Appellant said that he arrived home at 2:00 a.m.

 In 1999, however, appellant claimed that they drove away from the mall between 8:30 to 8:45
p.m. and arrived at the house of one of Pierce's friends at around 9:00 p.m. He claimed that he
arrived at his own home between 10:30 and 11:00 p.m., and that he and Springsteen remained there
for the night. Contrary to his 1998 statement, this sequence of events would place appellant at home
before law enforcement and firefighters responded to the fire at the yogurt shop. What makes his
1999 statement even more suspect is that appellant admitted that arriving home at 10:30 was
"unusual" because appellant and his friends "usually stayed out between 2:00 and 3:00 o'clock in
the morning." If one believed that appellant's memory of the day's timeline of events was hazy, one
would not expect him to describe a timeline differing so significantly from his usual practices.

 Of course, appellant's story continued to shift as the 1999 interview progressed. As the Court
observes, he contradicted himself on many of the details, giving details that were at times consistent
and at other times inconsistent with the forensic evidence. Appellant would often contradict himself
within the space of a single breath. He claimed numerous times that he had "a piss-poor memory."
Defense counsel characterized appellant's video statements as "an evolving confession" involving
a "constantly changing story." Both the court and defense counsel suggest that the shift in
appellant's stories was a phenomenon that would enable a rational factfinder to conclude that he
really possessed no knowledge of the offense at all.

 I disagree. The evidence shows that appellant's "poor memory" was caused by him making
stuff up as he went along. He had difficulty remembering what lie he had earlier told. This fact is
clearly shown by the contradiction between his 1998 and 1999 exculpatory statements. The later
inculpatory statements were simply more of the same. All the while, appellant was constantly trying
to minimize his criminal involvement as he struggled to find a story that the police would buy in
light of the other evidence he thought they might have. The sheer number of lies and amount of
equivocation in this case would leave any appellate court uncertain about many of the details of the
offense, including the exact roles played by the various participants. But the fact that appellant was
involved in the crime is not left uncertain. To the extent that the details might be important in
determining appellant's relative culpability for the purpose of determining punishment, no harm
occurred in this case because appellant received a life sentence. With respect to guilt, the lies and
the equivocation are simply more evidence tying appellant to the offense.

 But the record contains another confession, made by appellant near the time of the crime to
someone who was not an agent of law enforcement. Sometime before Sarah Statham was questioned
by the police, appellant had been questioned. Amanda, a close friend of appellant's and Sarah's
older sister, went over to his house "to see what was going on" when she met Welborn. This
surprised her because she did not know appellant and Welborn were friends. She heard appellant
tell Welborn "to keep his f---ing mouth shut." She asked appellant why the police had questioned
him, and he told her that she did not want to know. After the police questioned Sarah, appellant
arrived at the Statham residence and began hurriedly asking her what the police had asked her and
whether he was mentioned. Amanda took appellant aside and asked him to tell her what was going
on. After appellant mentioned Pierce and Springsteen, Amanda asked him again why the police were
talking to him, and he said "that he had done it." When she slapped him and called him a sick
bastard, he tried to laugh it off, but his response was so unconvincing that she concluded he had told
the truth. She was so upset that she told her mother. Although her mother told her not to tell the
police - partly because she supposed that, if they were guilty, the police would focus in on them, and
Amanda could step forward then - she did advise Amanda to have nothing further to do with
appellant, and Amanda followed that advice.

 Chandra Morgan also gave testimony that was consistent with appellant's incriminating
statements but inconsistent with his earlier exculpatory stories. Although appellant had initially
denied entering the yogurt shop at all that day, Morgan testified that she, appellant, Pierce, Welborn,
and another boy entered the shop while it was still open. Morgan further testified that, later, after
fire trucks were appearing at the yogurt shop, she was picked up and accompanied the boys to Gullet
Elementary. She also testified, consistent with appellant's confessions, that Welborn was not with
the other boys at the time she was picked up, but he soon joined them (arriving from the direction
of the yogurt shop). 

 Various circumstances suggest that appellant's life hit a turning point at the time of the
murders. As discussed above, Amanda Statham broke off their friendship. Appellant and
Springsteen also parted ways around that time. Early in the 1999 interview, appellant pegged
Springsteen's stealing his concert tickets as the reason for their falling out. And as the Court
observes, in response to a booking question regarding when he had contemplated committing
suicide, appellant replied that on December 6, 1991 - the date of the murders - he thought about
shooting himself.

 Appellant confessed to the police. He confessed to Amanda Statham. His two exculpatory
statements to the police conflicted with each other and with the testimony of another witness. All
of his statements, both inculpatory and exculpatory, placed him in the company of Pierce,
Springsteen, and Welborn on the day of and around the time of the murders, and statements made
by appellant to the police and to Amanda Statham indicate that the other boys were involved in or
connected to the crime. Appellant knew the money taken in by the yogurt shop was "dropped" and
that a revolver and a small automatic were used in the crime. December 6, 1991, was a noteworthy
day in appellant's life: he contemplated committing suicide that day, and shortly thereafter, at least
two of his close friendships broke down. That appellant tried to mislead the police in his statements
and to concede only as much as he thought he could get away with does not create a reasonable
doubt about the truthfulness of his admission that he was involved in the murder. I would hold that
the error in admitting Springsteen's statement was harmless beyond a reasonable doubt. I
respectfully dissent.

Filed: June 7, 2007

Publish 
1. "Of the numerous types of police deception, a misrepresentation relating to an accused's
connection to the crime is the least likely to render a confession involuntary. The police conduct
complained of here, concerning the strength of the prosecution's case against appellant, falls into
this category." Green v. State, 934 S.W.2d 92, 100 (Tex. Crim. App. 1996)(citation omitted).
2. 931 S.W.2d 244 (Tex. Crim. App. 1996).
3. Id. at 256.
4. Id.
5. Id. at 256-257.
6. Appellant called his wife twice during the interview.