

# IN THE
# TENTH COURT OF APPEALS

### No. 10-15-00151-CR

**ROBERT KENNETH PETERS,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 54th District Court**
**McLennan County, Texas**
**Trial Court No. 2014-630-C2**

## MEMORANDUM  OPINION

In one issue, appellant, Robert Kenneth Peters, challenges his conviction for intoxication manslaughter. *See* TEX. PENAL CODE ANN. § 49.08 (West 2011). Specifically, Peters contends that his trial counsel was ineffective because she did not object or attempt to suppress his statements, blood-alcohol results, or admissions contained within medical records. Because we conclude that an objection or motion to suppress the items above likely would not have been successful, we affirm.

## I.  BACKGROUND

After consuming numerous beers on the day in question, Peters drove his neighbor, James Eddins, to the gas station at the Brookshire Brothers on the I-35 frontage road in Lorena, Texas.  While there, Peters filled up his truck with gas, and Eddins filled a gas can.  After purchasing the gas, Peters did a "doughnut" around a light pole and then sped out of the parking lot at a high rate of speed without coming to a complete stop.  Peters then merged onto I-35.  While driving on I-35, Peters sped past a vehicle in the right lane.  When Peters came up behind another vehicle and attempted to change lanes to the left lane, his truck started to fishtail.  Peters was unable to regain control of his truck, which fishtailed to the grass median, left of the traffic lanes.  In the median, Peters's truck started "rolling over and over," eventually landing upright with a caved-in roof.  Even though he was wearing his seatbelt, Eddins's head came out of the passenger window and was crushed by the truck.  Eddins was discovered slumped in the passenger seat, not breathing and with no pulse.  Eddins was pronounced dead at the scene of the crash.  Peters was able to exit the vehicle, but he was "scratched up" and appeared to be in shock.  Peters was taken to the hospital for treatment.

Thereafter, Peters was charged by indictment with intoxication manslaughter.  *See id.*  The indictment also included an allegation that Peters used a deadly weapon, his truck, in the commission of the offense.  At the conclusion of the evidence, the jury found Peters guilty of the charged offense and made an affirmative finding as to the deadly-

weapon allegation. After rendering judgment in accordance with the jury's verdict, the trial court sentenced Peters to twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice. The trial court also certified Peters's right of appeal. This appeal followed.

## II. STANDARD OF REVIEW

To prevail on a claim of ineffective assistance of counsel, Peters must meet the two-pronged test established by the United States Supreme court in *Strickland* that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); *see Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). Unless a defendant can prove both prongs, an appellate court must not find counsel's representation to be ineffective. *Lopez*, 343 S.W.3d at 142. To satisfy the first prong, Peters must prove by a preponderance of the evidence that trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *Id.* To prove prejudice, Peters must show that there is a reasonable probability, or a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different. *Id.*

An appellate court must make a "'strong presumption that counsel's performance fell within the wide range of reasonably professional assistance.'" *Id.* (quoting *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)). Claims of ineffective assistance of

counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus. *Id.* at 143 (citing *Bone v. State*, 77 S.W.3d 828, 833 n.13 (Tex. Crim. App. 2002)). On direct appeal, the record is usually inadequately developed and "'cannot adequately reflect the failings of trial counsel'" for an appellate court "'to fairly evaluate the merits of such a serious allegation.'" *Id.* (quoting *Bone*, 77 S.W.3d at 833).

## III.   ANALYSIS

In his sole issue on appeal, Peters complains that his trial counsel was ineffective because she did not object to or attempt to suppress his statements, blood-alcohol results, or admissions contained within medical records. More specifically, Peters contends that his trial counsel should have objected to or suppressed: (1) his conversation with Texas Department of Public Safety Trooper Josh Cashion at the hospital; (2) the results of his blood-alcohol test because he did not voluntarily consent to the test; and (3) his medical records, which detail statements Peters made to a treating physician that he was drinking on the day in question.

### A.   Peters's Conversation With Trooper Cashion at the Hospital

Peters's first complaint pertains to Trooper Cashion's testimony about his initial conversation with Peters at the hospital. The record reflects that, on the day in question, Trooper Cashion received the following information: "He advised that there was a crash, uh, there was a driver and a passenger. The driver, uh, may have possibly been

intoxicated. The, uh, emergency personnel on the scene, first responder stated he had odor of alcohol beverage on his breath. And he stated the passenger was deceased." In response to this information, Trooper Cashion traveled to Hillcrest Hospital in Waco, Texas, where Peters was being treated.

Upon arriving at Hillcrest Hospital, Trooper Cashion was informed that Peters was "being worked on right now." Rather than barging in, Trooper Cashion waited for the nurses to tell him it was okay to visit with Peters. While waiting, Trooper Cashion noticed that Peters was wheeled down the hall for a CT scan and that Peters smelled of alcohol. Trooper Cashion recalled that he was six or seven feet away when Peters was wheeled down the hall and that he could still smell the alcohol on Peters's person from that distance.

After doctors completed the CT scan and returned Peters to his room, Trooper Cashion was informed that he could now visit with Peters. Trooper Cashion confirmed Peters's identity and asked him what happened. Peters told Trooper Cashion the following:

> Uh, he told me that he went to a Brookshire's in Lorena to get gas and that, uh, they were getting gas for his truck and they had a gas can, too, for the deceased vehicle, and said they were heading home. He said he blew a tire, and, uh, lost control of the vehicle, wasn't able to gain control and rolled it over.

While talking with Peters, Trooper Cashion observed that Peters smelled of alcohol on his person and on his breath and that his eyes were glassy and bloodshot.

Because Peters exhibited signs of intoxication, Trooper Cashion asked Peters if he had been drinking that day. Peters stated that:

> [H]e had four or five beers. Um, you know, typically ask—after that, you know once they tell us they've had beers, we ask what size. He said they were 12 ounce. And after that I ask him what type. You know, it matters between whether you're drinking a really light beer or you're drinking—I mean, there's beers out there with, you know, 15 percent alcohol in them. So it matters what type of beer you had. I asked him and he said it was a light beer. But he doesn't know which one it was. He wasn't sure which light beer he was drinking.

Trooper Cashion testified that he could not do standardized field-sobriety tests because,

> there was way too much going on in the room. He had the little finger monitor. Uh, he had, uh—they had a blood pressure cuff on him that wasn't hooked up. They had other sensors. He had an IV, um—you know, they had—at one point while I was in the room they put the catheter in. He had all this stuff on him. At one point the nurses told me they were worried about possible paralysis. So at that point, um, there's no—I can't do standardized field sobriety tests. I really can't do anything. I mean, his hands are—his whole body's busy. Uh, even if I would have tried to do the horizontal gaze nystagmus and look at his eyes, it would be too hard to do with the hospital bed because it was pretty high up at that time because they were working on him.

At the time of the interview, Trooper Cashion did not read Peters statutory warnings, did not place Peters in handcuffs, did not tell Peters he was under arrest, and later left Peters in the hospital without restraints or any law enforcement watching him. Nevertheless, it is this exchange that forms the basis of Peters's initial complaint about trial counsel's performance. Specifically, Peters argues that trial counsel should have objected or filed a motion to suppress these statements because they were not recorded and, thus, were inadmissible under article 38.22 of the Code of Criminal Procedure. *See*

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3 (West Supp. 2014). Essentially, this complaint centers on whether Peters was under arrest and subject to custodial interrogation at the time of the interview with Trooper Cashion.

Oral statements made by an accused as a result of custodial interrogation are not admissible unless made in compliance with the provisions of article 38.22 of the Code of Criminal Procedure. *See id.* But, statutory warnings are required only when the statement stems from custodial interrogation. *Id.*; *see Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

At trial, the defendant bears the initial burden of proving that a statement was the product of custodial interrogation. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009). A person is in "custody" only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained by law enforcement to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 324-25, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994)). The determination of "custody" must be made on an ad hoc basis, after considering all of the objective circumstances. *Dowthitt*, 931 S.W.2d at 255.

The Court of Criminal Appeals has described four general situations that may constitute "custody" for the purposes of article 38.22: (1) the suspect is physically deprived of his freedom of action in any significant way; (2) a law enforcement officer tells the suspect that he cannot leave; (3) law enforcement officers create a situation that

would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Gardner*, 306 S.W.3d at 294. In all four circumstances, the initial determination of "custody" depends on the objective circumstances of the interrogation, not on the subjective views of the interrogating officer or the person being questioned. *Dowthitt*, 931 S.W.2d at 255. In the first three circumstances, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* With regard to the fourth circumstance, the officers' knowledge of probable cause must be communicated to the suspect to constitute "custody." *Id.*

First, we note that it is not clear on this record whether or not the complained-of conversation was recorded. Therefore, Peters cannot carry his burden in demonstrating that the trial court would have erred in admitting the evidence over a proper objection under article 38.22, section 3 of the Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3. However, even assuming that the conversation was not recorded, we cannot say that the trial court would have sustained an objection made by Peters's trial counsel. None of the four circumstances outlined in *Gardner* are applicable in this matter. Law enforcement did nothing to deprive Peters of his freedom of movement. Rather, Peter's freedom of movement was restricted due to the medical treatment he was receiving because of the accident he caused. Furthermore, Trooper

Cashion did not tell Peters that he was under arrest or not free to leave prior to Peters confessing that he had been drinking on the day in question. Additionally, at the commencement of the interview, Trooper Cashion only knew that Peters was the driver in a single-vehicle crash and that a first responder had stated that Peters had an odor of alcohol on his breath. As such, it cannot be said that Trooper Cashion had probable cause to arrest Peters when the interview began. And even if he did, Trooper Cashion had not expressed it to Peters in any way. All of Trooper Cashion's actions to this point indicated that he was merely conducting an investigation and had not made an arrest decision. Therefore, considering all of the objective circumstances, we cannot say that Peters was under arrest and subject to a custodial interrogation when he first spoke with Trooper Cashion. *See Gardner*, 306 S.W.3d at 294; *see also Dowthitt*, 931 S.W.2d at 255. And because Peters was not under arrest at this point, the recording provision stated in article 38.22, section 3 of the Code of Criminal Procedure was not applicable. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3.

To the extent that Peters contends that he believed he was under arrest when he spoke with Trooper Cashion, we once again note that the initial determination of "custody" depends on the objective circumstances of the interrogation, not on the subjective views of the interrogating officer or the person being questioned. *See Dowthitt*,

931 S.W.2d at 255. Therefore, any objection by trial counsel on this issue likely would not have been successful.[1]

## B.    The Blood-Alcohol Test

Next, Peters complains about the blood-alcohol tests that revealed that he had a blood-alcohol level of 0.2—more than twice the legal limit for driving. In particular, Peters contends that his consent to the blood draw was not voluntary because he mistakenly believed that he was under arrest at the time the DIC-24 warnings were provided, Trooper Cashion made a baseless threat that he would get a warrant if Peters refused the blood test, and because Peters was impaired physically.

With regard to consent, the Court of Criminal Appeals has stated the following:

> A driver's consent to a blood or breath test must be free and voluntary, and it must not be the result of physical or psychological pressures brought to bear by law enforcement. The ultimate question is whether the person's will has been overborne and his capacity for self-determination critically impaired such that his consent to search must have been involuntary. We review the totality of the circumstances of a particular police-citizen interaction from the point of view of the objectively reasonable person. The validity of an alleged consent is a question of fact, and the State must prove voluntary consent by clear and convincing evidence.

---

[1] Though we are usually loath to speculate about trial counsel's strategy, it is worth noting that trial counsel may not have objected to the statements made by Peters to Trooper Cashion because it allowed Peters to offer his version of the facts with regard to the accident without having to testify himself. *See Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (noting that when the record is silent regarding the reasons for counsel's conduct, a finding that counsel was ineffective would require impermissible speculation by the appellate court). Indeed, Trooper Cashion recounted that Peters told him that the cause of the accident was a tire blowout—a fact that trial counsel relied upon in her closing argument. Had this testimony been objected to and excluded from the record, it would have eliminated Peters's primary causation argument made during guilt-innocence.

Critical to the consent analysis is that the fact finder must consider the totality of the circumstances in order to determine whether consent was given voluntarily. The trial judge must conduct a careful sifting and balancing of the unique facts and circumstances of each case in deciding whether a particular consent to search was voluntary or coerced. Accordingly, it follows that, because the fact finder must consider all of the evidence presented, no one statement or action should automatically amount to coercion such that consent is involuntary—it must be considered in the totality.

*Fienen v. State*, 390 S.W.3d 328, 333 (Tex. Crim. App. 2012) (internal citations & quotations omitted).

With regard to the blood sample, Trooper Cashion stated: "Since there was a strong odor of alcoholic beverage, had other signs of intoxication, he admitted that he had consumed alcohol, uh, I decided it was time to ask him—to talk about taking a blood sample. So, uh, I had the paperwork and everything with me. . . ." At this point, Trooper Cashion read the DIC-24 warnings to Peters and requested a blood sample. Peters consented to and ultimately provided a blood sample. There is no indication in the record that Peters hesitated, contemplated, or wavered in giving consent to the blood test. Additionally, the record does not reflect that Peters's physical or mental condition was so impaired that he could not voluntarily consent. In fact, Peters provided Trooper Cashion with a coherent explanation of his version of the facts involved in this case just prior to Trooper Cashion's request for the blood sample.

Trooper Cashion's actions were not coercive, and if anything, the DIC-24 warnings provided Peters with greater information on which to base his decision. In particular, the

DIC-24 warnings informed Peters that he had the right to refuse to submit to the taking of a specimen, though the warnings also explained the possible consequences of a refusal. Moreover, we do not believe that the warnings were inherently coercive so as to render Peters's consent involuntary. *See id.* at 335-36 (holding that extra-statutory warnings are not inherently coercive but that any coercive effect of the warnings should be determined by considering the totality of the circumstances in a particular case); *see also Bucaro v. State*, No. 02-14-00339-CR, 2015 Tex. App. LEXIS 9075, at **7-9 (Tex. App.—Fort Worth Aug. 27, 2015, no pet.) (mem. op., not designated for publication) ("Comparing the case at bar to *Fienen*, if the giving of the DIC-24 warnings *plus* the extra-statutory warnings present in *Fienen* were not inherently coercive, then the statutory warnings standing alone could not be inherently coercive. Applying *Fienen*, we hold that the giving of the DIC-24 warnings is not inherently coercive and does not violate the Fourth Amendment." (emphasis in original)). Therefore, based on our review of the totality of the circumstances, we conclude that there is clear and convincing evidence that Peters made a conscious and voluntary decision to consent to the blood draw. *See Fienen*, 390 S.W.3d at 333-36.

However, despite the fact that the totality of the circumstances weighs in favor of a finding that his consent to the blood draw was voluntary, Peters emphasizes the language in the DIC-24 warnings that state the consequences for refusing to provide a sample—namely, that Trooper Cashion could apply for a warrant authorizing a blood

draw in the event of a refusal. The Court of Criminal Appeals has repeatedly stated that a threat to seek or obtain a search warrant does not somehow render a consent to search involuntary. *See id.* at 335-36; *see also Johnson v. State*, 803 S.W.2d 272, 287 (Tex. Crim. App. 1990) (stating that "a consent to search given in response to a threat to seek or obtain a search warrant has been upheld as voluntary"); *Beaupre v. State,* 526 S.W.2d 811, 815 (Tex. Crim. App. 1975) ("The sheriff's statement that he was going to obtain a warrant to search the automobile did not render Mrs. Beaupre's subsequent consent for the search involuntary."). Thus, we cannot say that the language of the DIC-24 warnings that outlines the consequences for refusing to provide a sample renders Peters's consent to the blood draw involuntary. *See Fienen*, 390 S.W.3d at 335-36; *Johnson*, 803 S.W.2d at 287; *Beaupre*, 526 S.W.2d at 815. And because we have concluded that, under the circumstances of this case, Peters's consent to the blood draw was voluntary, any objection or motion to suppress filed by trial counsel likely would not have been successful.

## C. Peters's Medical Records

Peters's third complaint centers on the admission of his medical records, which contained statements he made to a treating physician about his social history and his conduct on the day in question. The record reflects that Peters's medical records were agreed to by both parties and that Peters told a treating physician that he drinks "up to a 6-pack per day, usually once or 2 times a week." Additionally, Peters told the treating

physician that he had consumed "at least 4 beers" prior to the crash.  On appeal, Peters asserts that these portions of the medical records were not legally admissible because the statements were hearsay and do not come within the purview of Texas Rules of Evidence 803(4).  *See* TEX. R. EVID. 803(4).

Even if we were to conclude that the complained-of statements were inadmissible hearsay, they are cumulative of the statements Peters made to Trooper Cashion while at the hospital—namely, that Peters had consumed four or five beers on the day of the incident.  Therefore, any harm from admitting the statements contained in Peters's medical records was harmless because the same information was already admitted into evidence through Trooper Cashion's testimony.  *See Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) ("An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection."); *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (holding that any error in the admission of hearsay testimony was harmless in light of other properly admitted evidence proving the same fact); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.").  Based on the foregoing, we cannot say that an objection or motion to suppress this evidence likely would have been successful.

## IV.   CONCLUSION

Because we have concluded that an objection or motion to suppress likely would not have been successful in any of the three aforementioned circumstances, we cannot say that Peters has satisfied his burden of proving by a preponderance of the evidence that trial counsel's representation fell below an objective standard of reasonableness—i.e., the first prong of *Strickland*.  *See* 466 U.S. at 687, 104 S. Ct. at 2064; *see also Lopez*, 343 S.W.3d at 142.  As such, we overrule Peters's sole issue on appeal and affirm the judgment of the trial court.


                                 AL SCOGGINS
                                 Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed November 12, 2015
Do not publish
[CR25]

