**Opinion filed December 31, 2018**



In The

# Eleventh Court of Appeals

———————

## No. 11-16-00358-CR

———————

### MARCUS DANIEL GRAY Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CR23575**

---

**M E M O R A N D U M   O P I N I O N**

The trial court convicted Marcus Daniel Gray of delivery of a controlled substance of less than one gram in a drug-free zone. The trial court assessed Appellant's punishment at confinement for ten years in the Institutional Division of the Texas Department of Criminal Justice, and it also assessed a $3,000 fine. However, the trial court suspended the imposition of the sentence and placed Appellant on community supervision for ten years. In a single issue, Appellant

asserts: "The trial court erred as there was insufficient corroboration of the evidence presented by only an accomplice and cooperating agent." Appellant contends that, except for the testimony of an accomplice witness and a covert-agent witness, there is no evidence that sufficiently connects Appellant to the offense. We affirm.

For a few months before the date of the alleged offense in this case, Brandy Stokes had worked as a confidential informant for Joe Aaron Taylor, an investigator for the City of Brownwood. Drug charges and forgery charges were pending against Stokes at the time. She was trying to get some "consideration" on those charges by serving as a confidential informant for Investigator Taylor. She ultimately went to prison on those charges, but she was on parole at the time of trial.

Investigator Taylor, who holds a bachelor's degree in psychology, a bachelor's degree in sociology, and a master's degree in conflict resolution and reconciliation, focuses on narcotics investigations. Investigator Taylor testified that, on the date of this offense, Stokes contacted him and told him that Breanne Jones had offered to sell her methamphetamine.

Jones testified that she was incarcerated at the time of trial. She appeared at trial and testified. On the date of the alleged offense, Stokes phoned Jones and wanted to buy methamphetamine; Jones was actively using methamphetamine at the time. Jones did not have any methamphetamine but told Stokes that, if anyone called Jones and said that they had any methamphetamine, she would call Stokes.

At the time that Stokes phoned her in search of methamphetamine, according to Jones's testimony, Jones was doing drugs with some friends and had already used all the "dope" that she had and had none to sell her. Later, Jones learned that Appellant had methamphetamine available. Jones contacted Stokes and asked Stokes to come pick Jones up and take her to Jones's house.

Stokes testified that she called Investigator Taylor and told him that she could buy methamphetamine from Jones. Investigator Taylor also testified that Stokes

2

contacted him and gave him that information. He instructed Stokes to contact Jones and order one-half gram of methamphetamine for $50.

After Stokes arranged the buy, Investigator Taylor searched Stokes and her vehicle, equipped Stokes with recording devices, and gave her $50 to make the buy. Investigator Taylor testified that Stokes told him that she was to pick Jones up and go to Jones's residence where Jones's "supplier" was. The deal was to be done at Jones's house because Appellant was already at her house in the driveway when he called her. Appellant's girlfriend, Elizabeth Fuentes, was also there. Jones did not name anyone else who was there except for her children and her mother, who stayed there to care for the children. Jones later testified that she had never been around any instance when Fuentes had any drug sales going on with anyone.

Investigator Taylor followed Stokes and Jones to maintain physical surveillance. He watched as Stokes parked behind a gray Chevrolet minivan in Jones's driveway. He noticed a white male standing by the minivan. He did not, at that point, recognize the white male.

Stokes likewise testified that, when they got to Jones's house, she pulled into the driveway behind a gray Chevy van. Stokes also noticed "a male, a guy, a white guy" around the driveway. She did not notice anyone else standing around the house. The record contains no evidence that there were any other males on Jones's premises at the time of the transaction. Later, when Investigator Taylor showed Stokes a picture of Appellant, she identified Appellant as the person who had been at Jones's house. Investigator Taylor testified that, on the recording made during the buy, Jones did not give the name of her supplier, but referred to him as "my guy." The audiotape also contains a recording of that part of the conversation between Jones and Stokes wherein Jones told Stokes that they were going to Jones's house to meet her "good homeboy" and explained that "it's always good" but that he does not hook her up enough for her to get high or to make any money. Jones also said that

3

she would "run in [her] house real quick and get it. He's a f-----g paranoid f-----g schizo." Before Jones and Stokes arrived at Jones's house, Jones talked to her supplier on the phone and asked him if he would come inside with her.

Stokes testified that, after she parked in Jones's driveway, she gave Jones the $50 that Investigator Taylor had given her to purchase methamphetamine. Stokes waited in the car while Jones and Appellant went inside the house. Jones testified that, once she and Appellant were inside the house, she gave Appellant the $50 and he gave her the methamphetamine.

Stokes testified that, after a few minutes, Jones came out of the house and got back in Stokes's vehicle. There is evidence in the record that, when Jones got in the vehicle, although she had said that she had used all of her "dope" before Stokes picked her up, she took a baggie from her bra and added some shards to the methamphetamine that Stokes was buying. When Jones was arrested later that night or early the next morning and taken to jail, a baggie was found in her bra. She testified that she did not have any methamphetamine on her when she went to her house with Stokes. Therefore, she says, any methamphetamine found on her person would have come from Appellant.

After Jones gave Stokes the methamphetamine, Jones went back inside the house, and Stokes left and met with Investigator Taylor. Stokes did not see Appellant again that night. Investigator Taylor, still surveilling the transaction, also testified that Jones was inside the house for several minutes before she returned to Stokes's vehicle and that Jones met with Stokes and then went back inside her house.

After Stokes made the buy, Investigator Taylor met with her and she gave him the methamphetamine that she had purchased. Investigator Taylor debriefed Stokes and returned to Jones's residence in an attempt to determine who the "white male" was that had been at Jones's house. When he returned, Investigator Taylor saw the gray minivan being driven away from Jones's residence. Investigator Taylor and

4

Officer Bruce Spruill of the Brownwood Police Department conducted a traffic stop of the minivan; the stop occurred about six or seven blocks from Jones's residence. Investigator Taylor was able to see the minivan from the time it left Jones's residence until it was stopped; no one got in or out of the minivan during that time. Elizabeth Fuentes and Appellant were the only people in the minivan. Fuentes was the driver; she declined to consent to a search of the minivan. Fuentes and Appellant gave conflicting stories about where they had been. Although Investigator Taylor was not allowed to search the minivan, he did, however, search Fuentes and Appellant, and he found no drugs, money, or weapons on them. During the stop, Investigator Taylor saw a packet of hypodermic syringes inside the minivan.

After Investigator Taylor and Officer Spruill had completed the traffic stop, they returned to Jones's house. There they found Jones hiding in a closet. She had a syringe loaded with methamphetamine; the syringe was the same type of syringe that Investigator Taylor had seen in the minivan. As we have noted, Jones testified that she had used all the "dope" that she had. As to the methamphetamine in the syringe, Jones was asked whether the drugs sold to Stokes totalled out to $50 worth. She responded, "Are you asking if I had any out of what was sold to [Stokes]?" When told, "[y]es," Jones answered, "I believe it's what they found me with; a loaded syringe." She testified that she did not always get her methamphetamine from Appellant, but on this occasion, she did.

Article 38.14 of the Texas Code of Criminal Procedure provides as follows: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by *other evidence* tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005) (emphasis added). This is the accomplice witness rule. "This rule is a 'statutorily imposed review and is not derived from federal or state constitutional principles that define

5

the legal and factual sufficiency standards.'" *Malone v. State*, 253 S.W.3d 253, 258 (Tex. Crim. App. 2008) (quoting *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007)).

Article 38.141(a) of the Texas Code of Criminal Procedure contains the following provisions relative to covert-agent testimony: "A defendant may not be convicted of an offense under Chapter 481, Health and Safety Code, on the testimony of a person who is not a licensed peace officer or a special investigator but who is acting covertly on behalf of a law enforcement agency or under the color of law enforcement unless the testimony is corroborated by *other evidence* tending to connect the defendant with the offense committed." CRIM. PROC. art. 38.141(a) (West 2005) (emphasis added). Subsection (b) of that article provides: "Corroboration is not sufficient for the purposes of this article if the corroboration only shows the commission of the offense." *Id.* art. 38.141(b).

Jones was an accomplice witness; Stokes was a covert-agent witness. The Court of Criminal Appeals has held that the standard for evaluating sufficiency of the evidence for corroboration under the accomplice-witness rule applies when evaluating sufficiency of the evidence for corroboration under the covert-agent rule. *Malone*, 253 S.W.3d at 258; *see* CRIM. PROC. arts. 38.14, 38.141. Under that standard, the State must produce *other evidence* that tends to connect the accused with the offense. *Malone*, 253 S.W.3d at 257. The Texas Court of Criminal Appeals has held that the testimony of accomplice witnesses does not constitute *other evidence*; accomplice witnesses cannot corroborate each other. *Chapman v. State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971).

When we review the sufficiency of the corroborating evidence as to Jones's testimony, we eliminate her accomplice-witness testimony and focus on the remaining evidence to determine whether there is evidence that tends to connect the defendant with the commission of the crime. *Malone*, 253 S.W.3d at 257;

6

*Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). When we review the sufficiency of the corroborating evidence as to Stokes's testimony, we eliminate her covert-agent testimony and, as with Jones's testimony, we focus on the remaining evidence to determine whether there is evidence that tends to connect the defendant with the commission of the crime with which he is charged.

In either case, the corroborating evidence may be direct or circumstantial, and it need not be sufficient by itself to establish a defendant's guilt. *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). Corroborative evidence is sufficient if it "tends to connect" the defendant to the offense. *See Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); *Taylor v. State*, 10 S.W.3d 673, 685 (Tex. Crim. App. 2000).

Although no precise rule has been set forth concerning the amount of evidence that is required to corroborate either accomplice witness testimony or covert-agent testimony, the Texas Court of Criminal Appeals has given some guidance on the issue. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). The corroborating evidence not need be in itself sufficient to establish guilt beyond a reasonable doubt. *Gill*, 873 S.W.2d at 48; *Munoz*, 853 S.W.2d at 559; *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992). Traditional legal and factual sufficiency standards do not apply to a review of corroborating evidence. *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999). It is not necessary that such evidence directly link the accused to the commission of the offense. *Dowthitt*, 931 S.W.2d at 249; *Gill*, 873 S.W.2d at 48; *Munoz*, 853 S.W.2d at 559; *Cox*, 830 S.W.2d at 611. While the accused's mere presence in the company of the accomplice or informant before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. *See Dowthitt*, 931 S.W.2d at 249;

*Gill*, 873 S.W.2d at 49; *Cox*, 830 S.W.2d at 611. Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration. *See Dowthitt*, 931 S.W.2d at 249; *Munoz*, 853 S.W.2d at 559. The absence of "smoking gun" evidence does not invalidate evidence that does connect the defendant to the offense. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999).

In their briefing in this case, both Appellant and the State seem to assume that covert-agent testimony cannot be used to corroborate accomplice-witness testimony and that accomplice-witness testimony cannot be used to corroborate covert-agent testimony. However, in cases like the one now before us, when the State offers both accomplice-witness testimony and covert-agent testimony and we are called upon to assess sufficiency of corroboration issues, we are confronted with the question of whether the testimony of a covert agent may be used to corroborate the testimony of an accomplice witness. Of course, the flip side of that question is whether the testimony of an accomplice witness may be used to corroborate the testimony of a covert agent.

Because the statutes do not prohibit it, we hold that, under Article 38.14 and Article 38.141 of the Texas Code of Criminal Procedure, accomplice-witness testimony can be used to corroborate covert-agent testimony and vice versa. It is true that both statutes have a common purpose to prevent convictions based upon inherently untrustworthy and unreliable testimony. The basic distrust of such testimony arises, in part, primarily from the finger pointing attributed to an accomplice and from the desire for favorable treatment sought by covert agents.

When we examine the two statutes at work in this case, we discover that the legislature has provided, in each statute, that the testimony described in the statute must be corroborated by *other evidence*; the legislature used no express words of limitation in either statute. Although the term *other evidence* understandably would

8

impliedly exclude the same category of evidence as that addressed within the statute, there are no other limitations stated in either statute. For instance, the accomplice-witness rule, by the terms of the statute, impliedly prohibits the availability of other accomplice testimony to corroborate the testimony in question. Similarly, the covert-agent rule would not allow for the use of other covert-agent testimony to corroborate the testimony in question. However, in neither statute do we find language that would, expressly or impliedly, prohibit the use of one category of testimony to corroborate another. Without such limitation, the language of the two statutes indicates that one type of testimony can corroborate the other.

Article 38.14 essentially provides that a conviction may not be had upon accomplice witness testimony unless corroborated by *other evidence* that tends to connect an accused to the offense. Article 38.141, in essence, provides that a conviction may not be had upon the testimony of a covert agent unless it is corroborated by *other evidence*. To Article 38.14, the testimony of a covert agent is *other evidence*. To Article 38.141, the testimony of an accomplice witness is *other evidence*.

Furthermore, each statute provides that a *conviction* may not be had upon the uncorroborated testimony of a covert agent on the one hand and the uncorroborated testimony of an accomplice witness on the other. When the testimony of a covert agent is used to corroborate accomplice-witness testimony, it is not being used to convict but, rather, to corroborate. As we have pointed out, the standard applicable to sufficiency to convict is not the same as the standard used when we review an issue of corroboration. Likewise, if an accomplice witness's testimony is used to corroborate a covert agent's testimony, the accomplice witness's testimony is not being used to convict, it is being used to corroborate. It is true that it might very well contribute to a defendant's conviction, but that is true of almost all testimony. In such cases, an accused is not being convicted solely on the testimony of an

9

accomplice or solely on the testimony of a covert agent, precisely the effect that is expressly prohibited in both statutes. And we regularly ask factfinders to judge the credibility of a witness and to decide the weight to be given to the testimony. Again, the corroborating testimony need not be sufficient to convict, it need only tend to connect the defendant to the offense. The standard is completely different.

There are those who have labeled the approach that we take as "absurd." *See Patterson v. State*, 204 S.W.3d 852, 859 (Tex. App.—Corpus Christi 2006, pet. ref'd); *see also* 43A George E. Dix & John M. Schmolesky, *Texas Practice Series: Criminal Practice and Procedure* § 51.106 (3d ed. 2017) (citing *Patterson*). When we consider the different standards at play, we respectfully disagree. The result might not be one that all would desire, but that does not put the statute into the "absurd" category. Neither the judiciary nor the legislature is in a position to anticipate each and every consequence of a law. Neither statute mentions the other, and we cannot rewrite them; only the legislature may do that. Neither statute is ambiguous, and we interpret them literally. The rules applicable to statutory construction require that we presume that the legislature meant what it said. "In adhering to this rule, we show our respect for the legislature and recognize that if it enacted into law something different from what it intended, it would amend the statute to conform to its intent." *State v. Vasilas*, 187 S.W.3d 486, 489 (Tex. Crim. App. 2006) (citing *Getts v. State*, 155 S.W.3d 153, 158 (Tex. Crim. App. 2005) (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004) ("It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result."))).

We are constrained to presume that, when the legislature passed Article 38.14 and Article 38.141 of the Texas Code of Criminal Procedure, it carefully selected the words that it used and that every word was used or omitted for a purpose. *Mireles v. State*, 444 S.W.3d 679, 683 (Tex. App.—Houston [14th Dist.] 2014, pet.

ref'd). In the absence of absurdity, it is not for the judiciary to add to or to subtract from lawful statutes enacted by the legislature. "It is not our place within the judiciary, however, to construe a statute based on our notions of what is rational or what makes good common sense." *Seals v. State*, 187 S.W.3d 417, 422 (Tex. Crim. App. 2005). The legislature knows how to rectify any problem that it sees with the statutes, and we respectively invite them to examine the statutes in question. If the legislature wants, it can amend the statutes to provide that the term *other evidence* does not include any evidence that must itself, by another statute, be corroborated. But that is its prerogative, not ours.

If the trial court considered the testimony of Jones as an accomplice and Stokes as a covert agent as *other evidence* to corroborate the testimony of the other, there was nothing in either Article 38.14 or Article 38.141 to prevent that, and the trial court did not err.

But if we are wrong, we nonetheless are of the opinion that Jones's accomplice-witness testimony and Stokes's covert-agent testimony are corroborated without each relying on the other for corroboration. Investigator Taylor testified that, on the date of the offense, Stokes phoned him and told him that she could buy methamphetamine from Jones. Investigator Taylor instructed Stokes to contact Jones and arrange to buy one-half gram of methamphetamine for $50. The evidence also shows that Investigator Taylor searched Stokes before she left to get Jones, equipped her with a video and audio recording device, and gave her $50 to use to buy the methamphetamine. Further, the testimony shows that Investigator Taylor followed Stokes in order to maintain physical surveillance. Stokes picked Jones up, and they drove to Jones's residence. Investigator Taylor watched as Stokes pulled into Jones's driveway and parked behind a gray Chevrolet minivan. A white male was standing by the minivan. At that point, Investigator Taylor did not recognize the white male.

11

The trial court heard the audio recording that was made during the buy. Jones told Stokes that they were going to Jones's house to meet her "good homeboy." She also told Stokes that "it's always good" but that he did not always hook her up with enough for her to get high or to make any money. Further, on the recording, Jones can be heard telling Stokes that she would "run in [her] house real quick and get it. He's a f-----g paranoid, f-----g schizo." Investigator Taylor testified that, on the recording, Jones referred to her source as "my guy." Investigator Taylor also testified that, when he showed Stokes a photograph of Appellant, she identified him as the male who was in the driveway at Jones's house. On the recording, Jones repeatedly referred to her source by use of a male pronoun. The record contains no evidence that any male other than Appellant was present during this transaction.

Investigator Taylor testified that Jones was in the house a matter of minutes then came back out and met with Stokes. Jones went back in the house and Stokes left and contacted Investigator Taylor. Although Investigator Taylor had searched Stokes and her vehicle before Stokes and Jones went to Jones's house and Jones and Appellant went inside, Stokes now had a baggie of methamphetamine, and she gave it to Investigator Taylor.

After Investigator Taylor debriefed Stokes and recovered the baggie of methamphetamine, he returned to Jones's house to try to identify the white male who had been standing beside the minivan. When he arrived, Investigator Taylor saw the minivan being driven away. When Investigator Taylor and Officer Spruill conducted a traffic stop about six or seven blocks from Jones's residence, Appellant was the only male in the minivan. Investigator Taylor had watched the minivan from the time it was driven away from Jones's house until the traffic stop, and no one got in or out of it. Appellant and Fuentes gave conflicting stories about where they had been before they were stopped. During the traffic stop, Investigator Taylor saw some

12

syringes in the minivan of the same type as he would momentarily see Jones preparing to use to inject methamphetamine.

We conclude that, even if we exclude the testimony of Stokes and Jones, there was ample evidence—including the physical evidence, the audio recording, and Investigator Taylor's testimony—that tended to connect Appellant to the offense charged. We overrule Appellant's sole issue on appeal.

We affirm the judgment of the trial court.


JIM R. WRIGHT

SENIOR CHIEF JUSTICE


December 31, 2018

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.;
Gray, C.J., 10th Court of Appeals[1];
and Wright, S.C.J.[2]

Willson, J., not participating.

---

[1]Tom Gray, Chief Justice, Court of Appeals, 10th District of Texas at Waco, sitting by assignment to the 11th Court of Appeals.

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.